[Crim. No. 476.   Third Appellate District.—August 4, 1919.]

THE PEOPLE, Respondent, v. WILLIAM ROSE, Appellant.

[1] CRIMINAL LAW — OBTAINING MONEY UNDER FALSE PRETENSES — NECESSARY ELEMENTS—INSTRUCTIONS—EVIDENCE.—In this prosecution for the crime of obtaining money under false pretenses, the court properly instructed the jury that "To constitute the offense charged, four things must concur and four distinct averments must be proved: 1. There must be an intent to defraud; 2. There must be actual fraud committed; 3. False pretenses must be used for the purpose of perpetrating the fraud; and, 4. The fraud must be accomplished by means of false pretenses made use of for the purpose, viz.: they must be the cause which induced the owner to part with his property"; and the jury was warranted in finding from the evidence introduced at the trial that the facts essential to the consummation of the crime charged existed in this case.

[2] ID.—REPRESENTATION OF DEFENDANT—RELIANCE UPON—EVIDENCE. In this prosecution for the crime of obtaining money under false pretenses, there was evidence to justify the theory that the prosecuting witness acted upon the representation by defendant that the check was good for the sum of two hundred dollars, and not upon the assurance of certain other persons that the defendant was a reliable person and that if the check proved "no good" they would indemnify and reimburse him.

[3] ID.—TESTIMONY OF ACCOMPLICE—SUFFICIENCY OF CORROBORATION.— In a prosecution for the crime of obtaining money under false

----

2. Giving worthless check as constituting false pretense, notes, 8 Ann. Cas. 1069; 14 Ann. Cas. 510; Ann. Cas. 1916E, 736.

pretenses, the corroboration of the testimony of an accomplice of the defendant need not be by evidence of itself sufficient to support the charge. If slight, but tending to connect the defendant with the commission of the crime charged, it is enough.

[4] ID.—REPRESENTATION THAT CHECK IS GOOD—WHAT IMPLIED.—The representation that a check is good necessarily carries with it the representation that the check is good for what it appears upon its face to be worth.

[5] ID.—CREDIBILITY OF WITNESSES—REVIEW BY APPELLATE COURT.— The appellate court, even with the added powers vested in it with respect to the review of questions of fact by section 4½ of article VI of the constitution, cannot consider the evidence for the purpose of determining whether the witnesses upon whose testimony the jury presumptively predicated their verdict testified to the truth or not.

[6] ID.—CONSIDERATION OF TESTIMONY OF ACCOMPLICE—FAILURE TO INSTRUCT JURY—WHEN ERROR NOT PREJUDICIAL.—The defendant in a prosecution for the crime of obtaining money under false pretenses cannot predicate error on the failure of the court to instruct the jury "that the testimony of an accomplice ought to be viewed with distrust," where he did not request the court to give such instruction, and, with the testimony of the alleged accomplice eliminated from the record, or wholly disregarded, the verdict would still have ample support.

[7] ID.—ELECTION TO WAIVE ASSISTANCE OF COUNSEL — NOT GROUND FOR REVERSAL.—Where the defendant, a man of intelligence and more or less familiar with the general rights of an accused on trial in the courts and with the methods of conducting jury trials, upon being arraigned upon the information, was asked by the court if he had or wanted counsel to conduct his defense, and he replied that he would attend to that matter, and he did not thereafter ask or request the court to appoint an attorney to defend him, but appeared at the trial without an attorney, announced himself ready when the case was called for trial, and himself managed and presented at the trial his own defense, his election to waive the assistance of a lawyer and to manage his own defense cannot be held a ground for reversal of the cause.

APPEAL from a judgment of the Superior Court of Sacramento County, and from an order denying a new trial. Malcolm C. Glenn, Judge. Affirmed.

The facts are stated in the opinion of the court.

6. Necessity as to cautionary instruction as to conviction upon uncorroborated evidence of accomplice, note, 15 **Ann. Cas.** 699.

Martin I. Welsh for Appellant.

U. S. Webb, Attorney-General, and J. Chas. Jones, Deputy Attorney-General, for Respondent.

HART, J.—By an information filed in the superior court of the county of Sacramento on the thirty-first day of March, 1919, defendant, William Rose, and one Nicholas Kinominas (whose name appeared later to be Kintominas) were charged with having obtained money by false pretenses from one Peter Hassouros (whose name also appears in the record as Hassouras). The defendant, Rose, had a separate trial, was convicted by a jury, and was sentenced to imprisonment in the state prison. He prosecutes this appeal from the judgment of conviction and from an order denying his motion for a new trial.

The prosecuting witness, Peter Hassouras, was in the restaurant business at 126 J Street, in the city of Sacramento. He testified that he first met the defendant about the eleventh day of January, 1919, and got to know him fairly well. On the thirty-first day of January, 1919, Rose asked him to indorse a check, which he presented to him, and which was in the words and figures following, to wit:

"Garden City Fruit & Produce Co.          11  No.  198.
     Packers and Shippers.
          (M)                    El Paso, Texas, Jan. 23rd, 1919.
     Pay to the order of George Pappas $200 00/xx
          Two hundred and no/100 Dollars.
                                             $203.77
                    Not over two hundred $200$
     For .......................
                    to the
El Paso Bank and Trust Company,          J. A. Sackler.
     El Paso, Texas."

Said check was indorsed: "George Pappas." Hassouras went with defendant to the California National Bank, both parties indorsed the check, the bank paid to Hassouras two hundred dollars, and he handed the same to defendant. The check afterward came back unpaid.

1. It is first contended by appellant that the evidence was insufficient to establish: (1) An intent to defraud; (2) That an actual fraud was committed; (3) That false

pretenses were used for the purpose of perpetrating the fraud; and (4) That those false pretenses were the cause which induced the owner to part with his money.

We may also consider in this connection appellant's second point, which is stated to be "that the prosecuting witness was not induced by representations of the defendant, Rose, to part with his money, but, on the contrary, relied upon the faith which he had in his own friends."

Peter Hassouras, a witness for the people, testified on direct examination that, on the day he indorsed the check, Rose said to him: "I have a check, two hundred dollars, and the bank here don't know me. Won't you indorse the check for me, to go and cash it?" Hassouras replied: "I don't think I will, because I don't know you." The witness continued: "There was two other fellows, Greeks, friends of Rose, they introduced me to him—they know Rose for a long time—he was a good man; they said: 'We are responsible for it, if the check is not good'; and that is how I went to the bank and cashed the check, on account of these two other friends of mine; I didn't have to indorse the check on account of Rose, because I don't know him before —just met him in the restaurant. . . . Q. Why did he want you to cash it, and not the bank—what did he say? A. He said because he didn't have any money here—he isn't acquainted here in this town. Q. And did he tell you the check was good? A. Well, he said—yes." The defendant, who was not represented by counsel at the trial, objected to the question as leading and the objection was sustained. The district attorney then asked: "What did he say about the check, when he asked you to cash it? A. He said: 'Mr. Hassouras, won't you indorse a check, two hundred dollars, for me, because I am not known here in this—in Sacramento, and no bank will cash this check for me.' I said: 'I will, but I don't know you.' Mr. Rose, he said—there is two other parties, two or three other boys— they said: 'If the check is not good, Mr. Hassouras, we are responsible for it.' I know these other people—they was friends of mine for ten years, and honest people, and that is the reason I indorsed the check."

On cross-examination by the defendant, the witness testified that defendant ate his meals in witness' restaurant nearly every day; that he was accompanied by his "part-

ner,'' Kintominas, the codefendant, and some other men. He repeated that he said he could not indorse the check for William Rose because he did not know him, and that he also said: ''But I will indorse the check for you boys.'' The witness testified that, at the preliminary hearing of the case, he had testified that on the day before he indorsed the check Kintominas told him ''that William Rose has a check of two hundred dollars in his own possession, and the check is good to his own knowledge, and William Rose looking for you to indorse the check.''

On redirect examination the witness said that the first one who asked him to cash the check was a man by the name of Jim Ledgeropous. . . . ''Q. Mr. Hassouras, at the time that you spoke about the check was first called to your attention in the place that morning when the defendant Rose and those other men were there, I will ask you if, at that time and place the defendant Rose at any time told you that the check was good. A. Yes.'' In answer to a question by the defendant, he said: ''At the time before we left the restaurant [to go to the bank], you and the two other fellows told me the check was no good.''

Nick Kintominas, the codefendant, was called as a witness on behalf of the people and testified: That, from April 18, to August 14, 1918, he, his brother, George Morgan, and John Gust Constantine Sackler were doing a wholesale fruit and produce business in El Paso, Texas, under the name of the Garden City Fruit and Produce Co., with a branch store in Los Angeles; that J. A. Sackler was authorized to draw checks on behalf of the firm against its account in the El Paso Bank & Trust Company; that he last saw Sackler in Tulsa, Oklahoma, in September, 1918; that Sackler had taken the balance of the firm's money, which caused it to cease business; that witness kept possession of the check-book and other books of the firm.

The check-book referred to was produced at the trial. In the body of the book are stubs numbered from 100 to 197, both inclusive, upon which are enumerated sundry amounts for which checks had been drawn. The stub of the check corresponding to No. 198 (the check in question) had been removed from the book. Checks 199, 200, and 201 had been removed from the book and there are no entries upon

the corresponding stubs.   Checks 202 to 396, both inclusive, remain in said check-book intact.

The witness testified that he met defendant, Rose, about two weeks before November 1, 1918, in Salt Lake and that he met him after that time in Los Angeles; that he (witness) paid the railroad fares of himself and defendant to Sacramento; that they came to Sacramento on January 13, 1919, and were living together at a hotel where witness paid the room rent; that the check-book above mentioned was in witness' suitcase in their room, and that defendant saw it about January 22d or 23d and asked what it was, to which witness replied: "This is book I have of El Paso, for our business"; that at that time checks numbered 198, 199, 200, and 201 were in the book.  He said that Rose knew all about the members of the firm of the Garden City Fruit & Produce Co. and knew that Sackler signed checks for the firm.  The witness testified that he was well acquainted with Sackler's handwriting and that the signature, "J. A. Sackler," on the check in question, was not that of Sackler.  He said that he first learned, on February 3 or 4, 1919, that a check had been taken from the check-book and cashed.  He testified: "Mr. William Rose came to me one night in the room, and he was walking in the room, he couldn't sleep.  I say: 'Rose, why couldn't you sleep?' He say: 'I couldn't sleep. . . . I am in a hell of a fix. That check I cashed last week, Mr. Hassouras, is no good, so I can't sleep good.'  Mr. Rose, he said: 'I take out from your own book the checks, too, and I wanted to cash it, because I needed the money.'  I told him: 'I didn't know what you were doing, and what you are doing since; I didn't need no money; I have money.' "

The information, in substance, charges that the defendants, Rose and Kintominas, for the purpose of cheating and defrauding one Peter Hassouras, and thereby obtaining the money upon the check in question, did, at the time and place therein named, "willfully and unlawfully, knowingly, and designedly, falsely, and fraudulently, pretend and represent to the said Peter Hassouros that a certain check and draft, in words and figures as follows, to wit: [following which is a copy of said check] was worth the sum of two hundred dollars, whereas, in truth and in fact the said check and draft was worth nothing, as they the said defend-

ants then and there well knew''; that said Hassouros, believing said false and fraudulent representations to be true, was induced thereby to deliver, and did deliver, to said defendants the sum of two hundred dollars, etc.

The information was embraced in the court's charge to the jury and was first read to them, and then followed full and clear instructions as to the nature of the crime charged, the vital elements of which it consists, and a statement that it was incumbent upon the prosecution to prove each of the essential elements of the crime to a moral certainty and beyond a reasonable doubt. [1] Among the instructions so given was the following:

''To constitute the offense charged, four things must concur and four distinct averments must be proved: 1. There must be an intent to defraud; 2. There must be actual fraud committed; 3. False pretenses must be used for the purpose of perpetrating the fraud; and, 4. The fraud must be accomplished by means of false pretenses made use of for the purpose, viz., they must be the cause which induced the owner to part with his property.''

The foregoing instruction, with sufficient clearness, states the facts necessary to be established to prove the commission of the crime here charged, and we think that a careful examination of the testimony, as taken at the trial and as disclosed by the record before us, will show that the jury were warranted in finding, as their verdict implies that they did find, that the facts essential to the consummation of the crime charged existed in this case.

[2] It may be conceded that Hassouras, in indorsing the check in question and thereby becoming responsible and liable to the bank for the integrity of that instrument, acted upon two considerations, viz.: 1. The fact that the defendant represented to him that the ''check was good''; 2. That the friends of Rose, referred to by Hassouras, assured the latter that Rose was a reliable person, and that, if the check proved to be spurious or worthless, or, as they put it, ''no good,'' they would indemnify and reimburse him for any loss suffered by him from his indorsement thereof. But, even with this concession, it does not follow that the jury was not warranted in finding that the inducing cause for his indorsement of the check was the representation made to him by Rose that the check was all

that it purported to be upon its face.  Indeed, we hold it
to be our duty to assume from the evidence that the jury
concluded that but for the representation by Rose to Has-
souras that "the check was good," thereby conveying to
the latter's mind the belief that the instrument was in all
respects what upon its face it appeared to be, Hassouras
would not have indorsed the check; for it is not reasonable
to suppose (and the jury may be assumed to have taken the
same view of the situation) that an honest and responsible
person, in his right mind, would deliberately, by his act of
indorsing a check for accommodation, impart to such in-
strument the force of his unqualified approval, if he be-
lieved or even suspected, at the time of doing so, that it
was fictitious or worthless, even though he received assur-
ances from third parties that the holder of the check was
an honest and reliable person and that they would make
good the loss if any occurred from such indorsement.
Therefore, we say that, while it might be true that Hassou-
ras was to some extent influenced to indorse the check by
the friends of Rose and their statement that Rose was a
reliable and trustworthy person, the jury could have found,
and it is our duty to assume that that was the theory upon
which they predicated their verdict, that the cause inducing
Hassouras to indorse the check was the representation by
Rose that the check was good or what it purported to be.
In other words, there is evidence to justify the theory that
Hassouras acted upon the representation by Rose that the
check was good for the sum of two hundred dollars and, in
support of the verdict of conviction, we are authorized to
presume that the verdict was predicated upon any theory
deducible from the evidence, which will support the charge
and the verdict.

The case of *People* v. *Weir*, 120 Cal. 279, [52 Pac. 656],
is to some extent an authority sustaining the foregoing
considerations.  There the defendant became engaged to
marry the prosecuting witness and after the engagement he
falsely represented to her that he had an opportunity of
receiving employment with a prominent real estate firm,
and that as a condition to such employment it was neces-
sary that he should deposit with the firm the sum of one
thousand dollars.  He further stated to her that he required
the sum of two hundred dollars to make up the sum so

required. His representation as to the employment and his representation as to the need of the one thousand dollars were false and untrue. He obtained the two hundred dollars from his fiancée upon those representations and thereafter disappeared and was seen no more by her until his arrest and prosecution for obtaining from her the two hundred dollars by the false pretenses mentioned. He was convicted of said crime and on appeal it was claimed in his behalf that the woman loaned him the money because of their engagement to marry and not because of his representation as to his alleged employment and the necessity for a cash deposit. The supreme court thus disposed of the contention: "The engagement simply acted as a leaven in placing her mind in that plastic condition in which it would the more readily absorb the false representations made by the defendant. Defendant also stated to the prosecuting witness that, if she would advance the two hundred dollars, they 'then could be married right away.' It is now contended that such statement was the superinducing cause which actuated the girl's mind in parting with the money. Again, we deem this a technicality of small dimensions, and the suggestions already made meet the contention. *Under any circumstances these questions were matters for the jury to decide.*"

In *People* v. *Gibbs*, 98 Cal. 661, 664, [33 Pac. 630], it is in effect held that where, in a case of obtaining money or property by false pretenses, several different false representations are alleged, a verdict of guilty will stand if one only of the false representations be proved, and in 19 Cyc., page 407, it is stated, upon the authority of the cases cited in the footnotes, that "although the pretense must be an inducing cause of the owner's parting with his property, it need not be the sole inducing cause. It is sufficient if it had a material influence in inducing the owner to part with his property, although he was influenced in part by other causes."

In the present case, well may it be said that the jury were warranted in finding that the assurances of Rose's friends to Hassouras that he (Rose) was a reliable man and that they would stand good for the loss to him if the check proved to be worthless merely had the effect of so influencing his mind as to have induced him the more readily

to act upon the representation of Rose that the check was what he claimed it to be and what it appeared upon its face to be.

That Rose knew, or at least that the jury were warranted in finding that he knew, that the check was worthless when he represented to Hassouras that it was good, is shown by the testimony of Kintominas, the substance of which is hereinabove produced. That witness, as seen, stated the circumstances under which Rose procured the check-book of the Texas firm of which Kintominas was a member and then told of Rose's confession to him that he had filled out the check in question and had procured it to be cashed, and explained, as he was worrying over his act, that he was "in a hell of a fix." It is, however, contended that Kintominas was an accomplice of Rose and that his testimony was not corroborated. Whether Kintominas was such an accomplice was a question of fact for the jury. We may assume that they accepted his testimony as verity, so far as the facts detailed by him were concerned, and concluded that he had nothing to do with the transaction. [3] But, conceding that Kintominas was an accomplice, there is ample corroboration of that portion of his testimony tending to show that Rose knew that the check was fraudulent and worthless or not what it purported to be, in the ·general surrounding circumstances of the transaction. The fact that he brought acquaintances to Hassouras to assure the latter that he was an honest and reliable man, the fact that he insisted that the check was "good," and the fact that it proved to be worthless constituted circumstances corroborative of the testimony of Kintominas tending to show that the defendant at all times knew that the check was worthless or of no value. The corroboration in such a case need not be by evidence of itself sufficient to support the charge. If slight and tends to connect the defendant with the commission of the crime charged, it is enough.

In this connection, we may consider the contention that there is no testimony that the defendant represented to Hassouras that the check was worth or of the value of two hundred dollars. [4] It appears from the record to be true that Rose did not, in so many words, or in express language specifically represent that the check was worth or was of the value of two hundred dollars, but he did rep-

resent it to be good when he presented it to Hassouras for his indorsement, and this statement necessarily carried with it the representation that the check was good for what it appeared upon its face to be worth, viz., two hundred dollars. Indeed, how could the check be good within the natural meaning of the word "good," as so applied, unless it was good for the amount it purported to be for? The question answers itself.

The officers of the bank, which honored and paid the check upon the indorsement thereof by Hassouras, testified that the check was fictitious and wholly without value, and that Hassouras, upon being notified of that fact, repaid the bank the amount it had given Rose on the check.

From the foregoing considerations, it appears with sufficient clearness that the jury, having accepted as correctly revealing the facts of the transaction relative to the check the testimony presented by the people, the salient portions of which are above considered, were justified in finding: 1. That the check was fictitious and worthless; 2. That Rose knew it to be so when he asked and induced Hassouras, by false and fraudulent pretenses as to the integrity of said check, to indorse it and thus become liable as an indorser upon it; 3. That, acting upon Rose's false representation that "the check was good" or that it was what it appeared upon its face to be, Hassouras indorsed the check; 4. That Rose's representations to Hassouras as to the check were false and untrue and were so made with the intent and the design fraudulently to obtain from and defraud Hassouras of the sum of two hundred dollars, the face value of the check; 5. That, upon such false and fraudulent representations, he did defraud Hassouras of said sum, and thereby actual fraud was committed. Thus it is clear that all the elements constituting the crime charged were, upon what appears to be sufficient evidence, found by the jury to exist in the transaction out of which the charge alleged in the information grew.

[5] Of course, this court, even with the added powers vested in it with respect to the review of questions of fact by section 4½ of article VI of the constitution, cannot consider the evidence for the purpose of determining whether the witnesses upon whose testimony the jury presumptively predicated their verdict testified to the truth or not. In

other words, the question as to the credibility of the witnesses is one which does not and cannot in the nature of the case come within the powers of a court of review, and the constitutional provision referred to cannot vest in such courts or clothe them with any such remarkable power. Indeed, no claim has ever been made so far as we know, that the said section of the constitution was intended to authorize a court of review to attempt so obviously an impossible act, and if any such claim should be made, it could not and would not be sustained. Therefore, where the testimony from which a certain result at *nisi prius* has been reached is not inherently improbable and is sufficient to support the conclusion arrived at, then, so far as is concerned the question whether the evidence supports the verdict or the findings, a reviewing court is powerless to interfere with the result arrived at below. In this case, the testimony upon which the jury evidently founded their verdict is not inherently improbable, and, as above stated, it is upon its face sufficient to uphold the verdict arrived at. We cannot, consequently, interfere with the verdict on the ground that it does not derive from the evidence sufficient support.

[6] It is next contended that the court erred to the prejudice of defendant's rights by its omission to instruct the jury with respect to the status under the law of an accomplice of the accused on trial when such accomplice becomes a witness against the accused and the peculiar consideration which the law says must be given an accomplice's testimony.

Section 2061 of the Code of Civil Procedure provides (among other things) that the jury are "to be instructed by the court on all proper occasions: . . . 4. That the testimony of an accomplice ought to be viewed with distrust," etc. There was in this case some evidence from which it might be inferred that Kintominas was implicated in the crime charged against Rose. In fact, Kintominas was jointly charged in the information with Rose with the commission of the crime of which the latter was convicted. The court gave no instruction based upon subdivision 4 of section 2061 of the Code of Civil Procedure, above adverted to. No such instruction was proposed by the defendant; but it is the contention that it was the court's duty to have given such

instruction upon its own motion and that its failure to do so was error.

It would have been well for the court, upon its own volition or initiative, to give an instruction explaining to the jury the status of an accomplice as a witness and how his testimony should be viewed and considered, but, under the circumstances of this case, its failure to do so cannot be held to have been prejudicial to the defendant. There is, as has already been shown, plenty of evidence without that of Kintominas, the alleged accomplice, to sustain the verdict. As seen, the testimony of Kintominas was particularly important in that it tended to show that Rose knew that the check was without any value whatever when he asked Hassouras to indorse it. But, it will also be borne in mind, Rose represented to Hassouras, without any qualifying language, that "the check was good." He was the holder and pretended owner of the check and knew the circumstances under which he received it into his possession. He knew more about the check than did Hassouras or the other parties who attested to his (defendant's) honesty before and to Hassouras. The fact that the check proved worthless is a strong circumstance tending to show that he knew the check was fictitious and worthless when he induced Hassouras to indorse it, and the jury were authorized from that fact to find that he at all times was aware of the worthlessness of the check and that his design in securing the indorsement of the instrument by Hassouras was to obtain from the latter in that fraudulent way the amount of money the check purported to be for. Thus it is plain that with the testimony of Kintominas eliminated from the record, or wholly disregarded, the verdict would still have ample support. It follows that the failure to give the instruction under the circumstances of this case can hardly be said to be error, inasmuch as the defendant did not request the court to give it, but, if erroneous, it cannot be held to have operated prejudicially against the defendant or to have produced a miscarriage of justice. (Const., art. VI, sec. 4½.)

In *People* v. *Lawlor,* 21 Cal. App. 63, [131 Pac. 63], the *defendant himself* requested the court to give a like instruction, and the court there held that, while the request should have been granted and the instruction given, in view of the quantity and convincing character of the evidence tend-

ing to show the guilt of the defendant, the error was without
prejudice and consequently could not justly be held to
have produced a miscarriage of justice.

In view of this conclusion, the cases cited by the appel-
lant in support of his contention that the court erred by
failure to instruct the jury upon the law relative to accom-
plices are of no consequence here. It may be suggested,
however, that in the following of those cases the instructions
were proposed by the accused, but, although pertinent to
the cases as made by the evidence, were disallowed by the
court: *People* v. *Bonney,* 98 Cal. 278, [33 Pac. 98]; *People*
v. *Silva,* 121 Cal. 668, [54 Pac. 146]. In the other cases
cited, which were decided long before section 4½ was in-
corporated into article VI of the constitution, the peculiar
circumstances thereof were such as to require it to be held
that the refusal or the failure of the trial court to in-
struct upon accomplices constituted prejudicial error.

[7] It is lastly contended that the cause should be re-
versed for the reason that the defendant was without counsel
to assist him in his defense. The argument on this propo-
sition seems to be that a legal trial of a person charged with
a public offense cannot be had unless, at such trial, the
accused has the assistance of an attorney at law in his
defense; but, obviously, this is not so. The argument is
based upon article I, section 13, of the constitution, which
declares that "in criminal prosecutions, in any court what-
ever, the party accused shall have the right to a speedy and
public trial; to have the process of the court to compel the
attendance of witnesses in his behalf, and to appear and de-
fend, in person *and with counsel.*" That provision of the
constitution, in so far as it relates to the right of an accused
to be represented at his trial by counsel, only declares and
guarantees that right, and does and can do no more than
that, for it still remains with the accused to determine for
himself whether he will exercise the right and so be attended
at his trial and defended therein by counsel. Of course,
if he desires to be so represented and assisted in his de-
fense by counsel, there cannot be a denial to him of that
right, even though he be without the necessary means to
employ and compensate the attorney. If, on the other hand,
he does not desire an attorney to assist him in his defense,
there is no law which can compel him either to employ one

for that purpose or to accept the services of one assigned to him by the court, should the court adopt that course.

In this case, the defendant, upon being arraigned upon the information, was asked by the court if he had or wanted counsel to conduct his defense and he replied that he would himself attend to that matter. It does not appear that he thereafter asked or requested the court to appoint an attorney to defend him, and he appeared at the trial without an attorney, announced himself ready when the case was called for trial, and himself managed and presented at the trial his own defense. If, therefore, he thinks he now has reason to believe that he suffered by reason of having no lawyer to assist him in his defense, he, and not the court nor the law, is to blame. He testified that he was a professional court interpreter, and from this fact we may assume that he is a man of intelligence and had from his experience as such an interpreter become more or less familiar with the general rights of an accused on trial in the courts and with the methods of conducting jury trials. We can, therefore, see no ground for excusing his neglect to secure, either by employment or by appointment by the court, if he was unable to pay for the services of one, a lawyer to represent him at the trial and conduct his defense. It certainly, under the circumstances of this case, cannot be held a ground for a reversal of the cause because the defendant, for reasons best known to himself, elected to waive the assistance of a lawyer and to manage his own defense.

It may be added, in this connection, that the defendant appeared to understand the situation presented at the trial remarkably well, for he seems to have cross-examined the witnesses testifying against him with no little degree of cleverness. Moreover, we can justly say that the case was tried by the court fairly and impartially and with a just recognition of the rights of the accused.

We conclude that there has been presented here no legal reason for sending the case back, and, therefore, the judgment and the order appealed from are affirmed.

Burnett, J., and Chipman, P. J., concurred.