[Crim. No. 4556.   Second Dist., Div. Three.   May 24 1951.]

THE PEOPLE, Respondent, v. JAMES S. ALLEN et al., Appellants.

Stahlman & Cooper, Grant B. Cooper, Percy V. Hammon, Robert E. Ford and Martin S. Ryan for Appellants.

Edmund G. Brown, Attorney General, Frank Richards, Deputy Attorney General, William E. Simpson, District Attorney, and Jere J. Sullivan, Deputy District Attorney, for Respondent.

BARTLETT, J. pro tem.—The appellants, Dr. James S. Allen and Marie O'Neil, were each charged in an information filed by the District Attorney of Los Angeles County with the crime of abortion in three counts and, in a fourth count, with the crime of conspiracy which count alleged that the appellants conspired together to violate section 274 of the Penal Code. In regard to this count six overt acts in furtherance of the alleged conspiracy were alleged: (1) that the appellants blindfolded Patsy Kelley; (2) that they blindfolded Anne Ulicsnu; (3) that they blindfolded Lorraine Ashley; (4) that the appellants occupied an office at 4809 Coldwater Canyon Road in the county of Los Angeles, State of California; (5) that the appellants caused to be printed professional cards under the name of Dr. A. L. Hammond; (6) that the appellants received certain sums of money as compensation for their illegal acts. Appellants waived trial by jury and the court adjudged the appellant Marie O'Neil guilty as charged in each count of the information and found the appellant Allen not guilty as to counts I and II of the information

and guilty as charged in counts III and IV. Each appellant made a motion for a new trial which was denied. Each has appealed from the judgments and the orders denying motions for new trials. The transcript is lengthy and we will not attempt to set forth a résumé of all the testimony in the transcript. On account of the contentions made by the appellants it is necessary to call attention to the following testimony.

The woman named in count I of the information, Patsy Kelley, testified that in the early part of February, 1949, she was pregnant and went to see a Dr. Ketridge regarding the matter and that following her conversation with him she went to 4811 Coldwater Canyon Road in Los Angeles County, California. Upon going there and entering the reception room, she talked to a receptionist and later on had a conversation with the appellant Marie O'Neil. The appellant told her not to worry about anything. They then went back into one of the offices and Marie O'Neil asked her to undress. Marie O'Neil then went away for a few moments, came back and asked the witness if she had any money with her. She told the appellant that she had $250 and asked her for a receipt as she had an insurance policy that would pay off anything that she paid on a doctor bill. Marie O'Neil said she would surely try to give her a receipt, went away and came back and said that was impossible. The witness then gave Marie O'Neil the $250 in cash. Marie O'Neil took her into another little room where there was a table and blindfolded her and then her legs were put up in stirrups of some kind on the table. She felt water poured between her legs and felt some cold metal in her vagina and after that she felt terrific pain. After feeling these sensations on the table, she went back to the anteroom and lay down for a long time. At the time of the operation, other than Marie O'Neil, she knew there was a man in the room by his voice but she did not get a glimpse of him. After that Marie O'Neil told her if she had any trouble to contact them. After she had been there about an hour, Marie O'Neil told her not to go out in the hall because the doctor was very strict about not having anybody see him. While she was resting in the other room she heard a girl come in who said she was scared and they told her not to be frightened. Then she heard a door slam and heard Marie O'Neil ask her to disrobe. This girl was in the room about a full hour. Marie O'Neil did not stay with the witness during that time. Marie O'Neil was with this girl and she heard the same man's voice in there

also. She heard the man's voice ask for an anaesthetic. Other than the fact that she was pregnant, the witness testified that she was in good health at the time she made this visit on February 10th. She noticed the name of Dr. James S. Allen on the window of this particular building.

Anne Ulicsnu, mentioned in count II of the information, testified that in the early part of February, 1949, she was pregnant. She went to an office in the valley on February 10, 1949, about a quarter of 12 and saw the appellant Marie O'Neil after having talked to a receptionist. A friend named Julia Molnar accompanied her and when she was asked for money, Julia Molnar handed $250 in cash to Marie O'Neil. Marie O'Neil asked the witness how far she was along and she told her three months. She was taken to another room and Marie O'Neil told her to undress.. She left her clothes in that room and went into another room where there was a doctor's table. She noticed instruments and metal things were in the room. She was told by Marie O'Neil to get on the table and Marie O'Neil put a mask on her. Then a man came in who she could feel examining her. Her legs were strapped up. The appellant Marie O'Neil was very nice and stayed with her. While she was lying on the table the nurse was holding her hands and she could hear a man's voice from the foot of the table. She was there for about an hour and a half. She felt uncomfortable and there was a scraping inside her vagina and she does not know with what instrument. She was then taken out of the room and laid on a cot where Marie O'Neil took off the blindfold. Marie O'Neil gave her instructions not to take a bath for two weeks and not to douche for two weeks and then pressed her stomach from the outside. Other than being pregnant she was not in ill health.

Julia Molnar next testified and said that she went to an office building in Coldwater Canyon with Anne Ulicsnu. She noticed the name of Dr. Allen on this building. After seeing a receptionist she met the appellant Marie O'Neil and Anne went inside and then came out and asked her for the money and she took in $250. She asked this nurse why she had to give the money to her before the operation was performed. The nurse said ''that would be putting the cart before the horse.'' Anne Ulicsnu went into the room about five minutes to 12 and came out about 20 minutes before 2.

Lorraine Ashley, who is named in count III of the information, testified that prior to the morning of February 15, 1949, she was pregnant but was otherwise in good health. She

stated that she talked to somebody about her pregnancy and her attention was directed to Los Angeles by the person to whom she talked. She took a taxi to an office building and saw a receptionist in a front office and then met a person who appeared to be a nurse. She had a friend with her named Laura Ashley who had come with her from San Francisco and who held the money. She then went to another room and was told to take off her clothes which she did. She was then blindfolded and laid down on a table, and was told to put her feet in stirrups which pulled her knees up. There was a man's voice and a woman's voice in the room and she felt a hard instrument in her vagina. Afterwards she was taken into another room and told to lie down and the blindfold was removed. When she was on the table she heard some buzzing and heard a nipping sound like scissors. Afterward she saw the appellant Dr. Allen on the premises and heard and saw him talking on a telephone. That was while the police officers were in the room.

Lois Shively, a policewoman of the city of Los Angeles, testified that she went to 4811 Coldwater Canyon Road on February 15, 1949. At about 9 o'clock she entered the building which had the name of Dr. James S. Allen on the outside. She went into the reception room where there were several people. Prior to that on February 13th she had called Sunset 20988 which was identified as Dr. Allen's telephone number and a female voice answered. She had asked to speak to Dr. Hammond and the voice said that she handled his appointments. The witness told her she was in trouble and the voice answered "I know." She then made an appointment and was asked who had referred her. Upon her reply that a friend of a friend of hers had referred her she was told that she would have to find out who referred her, bring that information with her and, upon asking how much it would cost, was told that her friend would tell her everything. In a subsequent conversation with the appellant O'Neil, Miss O'Neil identified herself as being the person with whom the witness had had the conversation. The witness entered the doctor's office at a few minutes before 10 and was told that she would have to wait a short time. Two other police officers entered a few minutes before 10:40 and she motioned them to go out which they did. Immediately the receptionist came back into the reception room and she and another woman went to the door and looked outside about which time Officers

Jokisch and Burton entered. The receptionist pushed the buzzer and there was a lengthy ring. The receptionist was then stopped by the officers and Sergeant Jokisch forced his way through a door. The witness stated that three of the ladies tried to run out the door the officers had entered and she jumped up and identified herself and asked them to be seated. The witness was then shown to card appearing to be a business card with the name Dr. A. L. Hammond on it and identified it as a card which she had taken shortly after this from the purse of the appellant Marie O'Neil. When she was searching the purse the witness told Marie O'Neil she was looking for some type of record or a sheet of paper with the name she had given to Marie O'Neil, Lois Anna Clark, to show her appointment for that day and Marie O'Neil said that she would not find any; that she kept no record for appointments for that day, she just kept them in her head. Sergeant Burton asked Marie O'Neil where she got this card of Dr. Hammond's and she said that she used to work for him. She saw Lorraine Ashley lying on a little bed in the first small office and had a conversation with the appellant O'Neil in the presence of Lorraine Ashley and Dr. James Allen. Dr. James Allen was the only man on the premises until the raid took place. Later at another conversation Lorraine Ashley asked Marie O'Neil whether she should buy some suppositories or something and Marie O'Neil gave her what she called "some post instructions." The witness took Lorraine Ashley to the receiving hospital where Lorraine Ashley saw Dr. Lloyd E. Overholtz.

Officer Burton, one of the arresting officers, testified that he went to 4811 Coldwater Canyon Road at about 7:30 a. m. on February 15th and parked where he could view the three doors to the office. A little before 9 o'clock the receptionist arrived and about five minutes later two girls came out and went to a drugstore. About 9:15 the appellant Allen entered the rear door of the office. The girls that had gone to the drugstore had entered the front door. At 9:45 another girl entered. In the meantime Officers Jokisch and Shively arrived and he and Jokisch entered the waiting room at about 10 o'clock. They saw Lois Shively sitting there with other women. They went out and returned to the parking lot and a woman came out of the office and looked at them and went back in. The officers again entered the building and as Jokisch entered the door the receptionist started ringing the buzzer which could be heard in the back lot. The witness

went through the hallway in back of the office where he could see the appellant Allen taking off his smock. Dr. Allen was the only male person on the premises. He also saw Lorraine Ashley there. She was the first girl he had seen enter the office.

Edwin W. Jokisch testified that he was a police officer of the city of Los Angeles. That as a police officer he went to 4811 Coldwater Canyon Road on several occasions and that the name on the window was that of Dr. James S. Allen. He further stated that he had the place under observation on February 10, 1949, and upon that occasion saw Patsy Kelley arrive there and also saw Anne Ulicsnu and Julia Molnar come. He had also observed the appellant James S. Allen arrive carrying a bag and walk in the back door. He observed that anyone in the front reception room could not see a person from that particular door. He again had this office under surveillance on February 15, 1949, and saw Lorraine Ashley arrive and enter the building sometime between 9 and 9:30. When he entered the building at the time of the arrest Lorraine Ashley was lying on a couch or bed. She was covered up with a blanket. That was after 10:45 a. m. Going into the place he identified himself, said that he was a police officer and started over to a door and told the receptionist if she did not open it he would break it down. He put his shoulder to the door and the door opened and he saw the appellant Marie O'Neil in the hallway. As he turned the corner to the right he saw the appellant Allen removing his white jacket and told him he was under arrest. The witness then proceeded to the back door, opened it and admitted Inspector Ruppers of the State Board of Osteopathic Examiners. During the course of his examination of the office he took into his possession certain sets of surgical instruments, certain antiseptics and bundles containing towels with a piece of cotton padding folded inside of them. He also found an operating table equipped with stirrups. He had a conversation with the appellant O'Neil during the course of which she told him she had worked for Dr. Allen for about three or four months and that he paid her about $300 per month. Prior to that time she had been working for Dr. Ketridge. She identified one of the towels that he showed her as the blindfold that had been used on Lorraine Ashley. He also removed some wet bloodstained cotton from a waste receptacle. Dr. Allen was the only male person on the premises

up until the time of the raid. He asked the appellant Marie O'Neil about Dr. A. L. Hammond whose name he found on a card and she said there was a doctor she used to work for by that name. He testified that he asked the appellant Allen if he had treated anyone that morning and he said that he had but that she was a patient of another doctor who rented that portion of his office. He further stated that he did not know the name of the other doctor but that that doctor paid him $150 rent.

George E. Ruppers, the inspector of the State Board of Osteopathic Examiners, testified that he accompanied Officers Jokisch and Burton to 4811 Coldwater Canyon Road at the time of the raid. He also testified that he had examined the records of those licensed to practice osteopathy and found no person named A. L. Hammond licensed to practice osteopathy in the State of California. Dr. Lloyd E. Overholtz was the doctor to whom Lorraine Ashley was taken at the Van Nuys Emergency Hospital after the raid. He gave her a pelvic examination and found rather profuse vaginal bleeding. The particular uterus of this person was larger than it should be for a female not pregnant. He could not tell whether she was pregnant at the time he examined her and did not ascertain the origin of the bleeding any more than it was due to some treatment she had received. He was shown drugs taken from the office by Officer Jokisch and identified some of them as local anaesthetics used to allay pain and one as a lubricating jelly used on the speculum to insert it. He was shown the three sets of instruments found by Officer Jokisch in Dr. Allen's office and his testimony was that they were the type of instruments that could be used for an abortion, that they are the type of instruments found in the offices of general practitioners but that ordinarily a doctor does not have three sets unless he is doing genitourinary work. The witness testified that he had practiced 20 years and had but one set.

Dr. Robert A. Loehr was a physician practicing in San Jose, California. Lorraine Ashley was his patient and he saw her several times in December, 1948, and examined her also on the 29th of January, 1949, and was under the impression that she was pregnant. She was a normal girl. He saw her again on February 18th when she had a temperature of 99 and again on February 21st when the vaginal discharge had nearly stopped and she was feeling better.

The defendant Allen took the stand in his own behalf and among things that he testified to were the following: That

he occupied the office located at 4809-11 Coldwater Canyon Road in the county of Los Angeles and that he was in his office on February 10, 1949, and February 15, 1949. He denied that he had performed any operations upon Patsy Kelley or Anne Ulicsnu. He testified that he rented the building where his office was located and that on February 15, 1949, he told Marie O'Neil to prepare the patient Lorraine Ashley and put on his white smock; that he "treated" Lorraine Ashley and that the instruments he used upon this patient were his; that Marie O'Neil assisted him on that occasion. While he said Marie O'Neil was not in his employ he did state that she had assisted him in preparing patients on a few other occasions. He further testified that after Miss Ashley left the table, he heard the buzzer and the door burst open and that the officers came in while he was removing his white smock. Marie O'Neil did not take the witness stand.

The appellant Marie O'Neil contends that the evidence is insufficient to sustain the conviction of appellant as to the charges set forth in the first three counts of the information and also that the corpus delicti of each of the offenses charged was not proven. The appellant Allen makes the same contentions as to himself in regard to count III. The burden of the argument of appellants is that section 1108 of the Penal Code requires that upon a trial for the procuring of or aiding or assisting in an abortion, the defendant cannot be convicted upon the testimony of the woman upon whom the offense was committed unless she is corroborated by other evidence. It is urged that this corroborating evidence does not exist. In considering the evidence in the record other than that of the woman upon whom the abortion was committed there are certain legal principles to be taken as a guide. ▮ In the first place even though the corroborating evidence be slight and if standing alone entitled to little consideration, if it creates more than a suspicion, it is sufficient. (*People* v. *Wilson,* 25 Cal.2d 341, 347 [153 P.2d 720].) ▮ Testimony relating to one count of the information may be considered by the trier of fact in corroboration with the testimony of an aborted woman referred to in another count. (*People* v. *Malone,* 82 Cal.App.2d 54, 63 [185 P.2d 870].) ▮ In relation to the appellant Allen as to count III of the information, inferences from his own testimony may be considered in corroboration of the testimony of Lorraine Ashley. (*People* v. *Malone, supra,* 82 Cal.App.2d 54, 63.) Also, as to the

appellant O'Neil, her own statements to the arresting officers and the inferences to be drawn from them may be taken into account as evidence in corroboration. ■ The surrounding circumstances as testified to by other witnesses and inferences which may be drawn from them, are corroboration. (*People* v. *Wilson, supra,* 25 Cal.2d 341, 347.) The same case states that the testimony of the woman alleged to have been aborted as to the use of instruments does not need special corroboration and, in the case we have here, three sets of surgical instruments by use of which abortions could be performed were found on the premises and introduced in evidence as well as pain alleviating drugs, sterilizing drugs and also a blindfold which appellant O'Neil stated she had used. ■ There is no intimation in any of the testimony that any one of the operations was necessary to preserve life and nonnecessity may be shown by circumstantial evidence. (*People* v. *Ramsey,* 83 Cal.App.2d 707, 718 [189 P.2d 802].) The evidence in this case shows that each of the women in question was, except for the fact that each of them was pregnant, a normal, healthy woman. ''Whether the corroborating evidence by itself is as compatible with innocence as it is with guilt is a question for the trier of fact, not for the reviewing court.'' (*People* v. *Estes,* 99 Cal.App.2d 745, 747 [222 P.2d 454].) In *People* v. *Newland,* 15 Cal.2d 678 on page 681 [104 P.2d 778], it is said: '' '. . . For it is the function of the jury in the first instance, and of the trial court after verdict, to determine what facts are established by the evidence, and before the verdict of the jury, which has been approved by the trial court, can be set aside on appeal upon the ground' of insufficiency of the evidence, 'it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below. . . .' ''

In considering this question of corroboration, the appellant Allen under the heading *''Rules Governing the Determination of the Sufficiency of Evidence Offered for Corroboration''* states as his major premise, *''The Testimony of the Prosecutrix Must Be Eliminated from the Record.''* (Italics are appellant's.) In support of this statement he cites *People* v. *Reingold,* 87 Cal.App.2d 382 [197 P.2d 175].) What the court said in that case is set forth as follows on pages 392, 393: ''As to what constitutes sufficient corroboration of the testimony of an accomplice, we have the following rule enunciated by our Supreme Court in the case of *People* v. *Morton,* 139 Cal. 719, 724 [73 P. 609], wherein the following language

taken from *Weldon* v. *State,* 10 Tex.App. 400, is quoted with approval:

" '. . . eliminate from the case the testimony of the accomplice, and then examine the evidence of the other witness or witnesses with the view to ascertain if there be inculpatory evidence—evidence tending to connect the defendant with the offense. If there is, the accomplice is corroborated; if there is no *inculpatory* evidence, there is no corroboration, though the accomplice may be corroborated in regard to any number of facts sworn to by him.' " This case and all California cases upon the same subject are analyzed at length in the later case of *People* v. *Griffin,* 98 Cal.App.2d 1, at pages 23 to 28 [219 P.2d 519] inclusive, and the court there comes to this conclusion: "In view of these more recent decisions of the Supreme Court we conclude that the test suggested in *People* v. *Morton, supra,* and followed by *People* v. *Reingold, supra,* is not an exclusive method of analyzing the sufficiency of evidence corroborative of the testimony of an accomplice. We conclude further that such evidence may be held sufficient if it connect the defendant with the crime in such a way as reasonably to satisfy the fact-finding body that the accomplice is telling the truth." This court also says (pp. 24, 25): "It is not necessary that the corroborative evidence prove independently either that the defendant is guilty of the offense or that he is guilty beyond a reasonable doubt. (*People* v. *Ames,* 39 Cal. 403; *People* v. *Rose,* 42 Cal.App. 540 [183 P. 874]; *People* v. *Blunkall,* 31 Cal.App. 778 [161 P. 997]; *People* v. *Thompson,* 16 Cal.App. 748 [117 P. 1033]; *People* v. *Leavens,* 12 Cal.App. 178 [106 P. 1103]; *People* v. *Melone,* 71 Cal.App.2d 291 [162 P.2d 505]; *People* v. *Baskins,* 72 Cal.App.2d 728 [165 P.2d 510].) If this were not true and if it were required that a complete case for the prosecution be established without reference to the testimony of the accomplice, there would then be no occasion to offer the accomplice as a witness."

We have set forth testimony that was before the court in regard to these counts of the information. It is not necessary to repeat that testimony here as an examination of it discloses that, guided by the principles of law we have heretofore set forth and construing it in the light most favorable to respondent, it is ample to sustain the conviction of the appellant O'Neil as to the first three counts of the information and as to the appellant Allen on the third count.

So far as proof of the corpus delicti is concerned the testimony of each of the women named in the first three counts of the information was sufficient if it was adequately corroborated by competent facts, circumstances, or reasonable inferences to be drawn from the evidence. (*People* v. *Ramsey,* 83 Cal. App.2d 707, 717 [189 P.2d 802].) In this case that corroboration was present.

Both appellants contend that the evidence is insufficient as a matter of law to sustain the conviction of the offense set forth in count IV which charges that a conspiracy existed between this doctor and this nurse. We agree with appellants that the nature of a conspiracy renders it difficult of proof but that difficulty of proof will not excuse lack of proof in a criminal proceeding. What we have said with reference to the other three counts and much of the law which we have cited is applicable to this count of the information.

Usually a conspiracy can only be proved by circumstantial evidence and it is not necessary to prove an actual agreement to work together to perform the unlawful acts charged. It may result from the actions of the parties in which an intent is shown to carry out a common purpose to violate a law. (*People* v. *Steccone,* 36 Cal.2d 234, 236 [223 P.2d 17]; *People* v. *Griffin, supra,* 98 Cal.App.2d 1, 43, 44.)

We have reviewed the situation regarding the overt act charged as to Lorraine Ashley. The appellant testified and he asserts that his explanation of the Ashley incident was wholly compatible with his innocence on that count. That is a matter of opinion, but assuming it to be true, although the appellant's own story exculpates him, it is for the trier of fact to say whether that story should be believed. (*People* v. *Borrego,* 211 Cal. 759, 765 [297 P. 17].) Also we have set forth in detail the testimony of the nonaccomplice witnesses and it would serve no useful purpose to repeat it here.

The combined and cumulative weight of all this testimony and the exhibits admitted in evidence demonstrated that the act was done as a result of a common design between the physician, Dr. Allen, and the nurse, Marie O'Neil. We are not unmindful of the cases cited by appellants in their briefs but whether there is insufficient evidence to support a conviction must depend upon the circumstances of the particular case under review.

Appellant Allen contends that the court committed error in permitting the prosecuting witnesses to testify to

conversations with his codefendant, Marie O'Neil, outside of his presence. These questions were objected to on the grounds that they were incompetent and hearsay, there being no proof of the conspiracy. Appropriate motions to strike this testimony were made. ██ It is the general rule that, ordinarily, proof of the existence of a conspiracy should precede the introduction of such evidence. ██ It can be said of this case as was said in *People* v. *Matthew*, 68 Cal.App. 95, 107 [228 P. 417]: "Thus where, as here, the facts from which the conspiracy is to be inferred are so intimately blended with other facts going to constitute the crime that it is difficult to separate them, it is not essential to the introduction of evidence of the acts and declarations of one of the conspirators that evidence should first be introduced to establish *prima facie*, in the opinion of the court, the fact of conspiracy." This case was tried by the court without a jury. The order of proof was within the discretion of the court (*People* v. *Ferlin*, 203 Cal. 587, 599 [265 P. 230]), and its rulings in regard thereto will not be disturbed on appeal except upon clear proof, which we do not have here, that the court abused that discretion. (*People* v. *Griffin*, 98 Cal.App.2d 1, 47, 48 [219 P.2d 519].) The same situation exists in regard to the rulings of the court admitting evidence as to the extrajudicial acts and declarations of the alleged coconspirator Marie O'Neil.

██ The appellant Allen contends that the court erred in admitting into evidence several exhibits relating to cards bearing the name of "Dr. A. L. Hammond." These cards are referred to in the allegations concerning one of the overt acts set forth in count IV of the information.

Otto Riggin, a printer of Van Nuys, testified that he knew the appellant Allen who was a regular customer of his. A card was shown to him which read as follows:

"SUnset 2-0988                                    SUnset 15141
                                                 (Written in ink)
                         A. L. HAMMOND
                         (Printed in ink)
                    Dr. ~~James Stratford Allen~~
                 (Line drawn through name in ink)
      4809 Coldwater Canyon Avenue, Van Nuys, California."

Both telephone numbers shown thereon are those of Dr. Allen and the address given is that of Dr. Allen. Mr. Riggin testified that he had no independent recollection of the event or by whom the order was given, but that it was a card which was brought to his office for reproduction and one of the tele-

phone numbers was in his handwriting. Such cards printed in his shop were also received in evidence. His records, kept in the ordinary course of business, showed the job was charged to Dr. James S. Allen. Appellant said: *"The record* is devoid of any testimony that the cards were ordered by Dr. Allen or anyone authorized to order them on his behalf. There is no evidence connecting him in any way with having ordered the cards or possessing them. That being so there is utterly no foundation for their introduction into evidence." To make that statement is to ignore the testimony of Lois Shively and Officer Jokisch and the statements made to them by Dr. Allen's coconspirator, Marie O'Neil. These cards were received in evidence after all of the prosecuting witnesses had testified and the conspiracy had been established. Lois Shively had testified she called Dr. Allen's telephone number, asked for Dr. Hammond and made an appointment to see him at the address given on the card. Marie O'Neil told Lois Shively and the other officer that she was the one with whom the conversation was had and who made the appointment for Dr. Hammond. A card of Dr. Hammond's printed by Mr. Riggin's establishment was found in the purse of Marie O'Neil and was one of the exhibits. The Inspector of the State Board of Osteopathic Examiners testified the record showed no A. L. Hammond was licensed to practice osteopathy in California. It will be seen that there was ample foundation for the introduction of these cards.

Finally, the appellant Allen complains of the admission of the testimony of Dr. Loehr of San Jose who was Lorraine Ashley's physician. He testified to certain statements made by his patient both before and after her trip to Los Angeles including her statement that she had had an abortion performed. The court strictly limited the testimony of Dr. Loehr to statements which were part of the case history obtained from his patient. All other statements were stricken by the court and, as to those admitted, counsel for appellant requested that they be received merely for the purpose of the history and it was as such only that they were received. There was no error in admitting this evidence. (*People* v. *Shattuck*, 109 Cal. 673, 678, 679 [42 P. 315].)

The judgments and orders are affirmed.

Shinn, P. J., and Vallée, J., concurred.

A petition for a rehearing was denied June 5, 1951, and appellants' petition for a hearing by the Supreme Court was denied June 18, 1951.