[Crim. No. 3602. Second Dist., Div. One. Dec. 7, 1942.]

THE PEOPLE, Respondent, v. EDMUND MARINEAU et al., Appellants.

894

Donald Mackay, Adolph Alexander and Sylvan Covey for Appellants.

Earl Warren, Attorney General and Gilbert F. Nelson, Deputy Attorney General, for Respondent.

DORAN, J.—Appellants were charged in an information filed by the District Attorney of Los Angeles County with the violation of section 274 of the Penal Code in that on or about September 15, 1941, in said county, they did wilfully, etc., provide, supply, administer, procure, use and employ an instrument upon the person of one Reva Shirley, a woman, with the wilful and felonious intent then and there to procure the miscarriage of said Reva Shirley, and that the use and employment of said instrument to procure a miscarriage was not necessary to preserve her life. In a second count of the information appellants were charged with violation of the same section in that on or about October 6, 1941, they did the same acts in connection with one Estelle Stein. Motion to set aside the information was denied as to each appellant and each appellant entered a plea of not guilty as charged. After a trial by jury verdicts were returned finding each appellant guilty as charged in each count. Motions for new trial on behalf of each appellant were denied; and appellants were sentenced. In the case of appellant Vremsak, the sentence was suspended and appellant was granted probation on certain terms. The appeals here taken are from the order denying the motions for new trial and from the judgments of conviction.

Appellants contend that the court erred in admitting evidence of other acts and offenses not charged in the information; that there was error in admitting the testimony of a woman deputy sheriff as to her going to the office of appellant Marineau and there submitting herself to an examination; that there was error in the admission of certain other evidence and in the admission of a certain purported accusatory statement; that there was insufficient corroboration of the testimony of accomplices; and that the court erred in giving certain instructions. On behalf of appellant Vremsak, in addition, it is urged that the evidence offered was insufficient to sustain a conviction, as to her, upon either count

of the information; and that the prosecution failed to prove guilty knowledge on the part of said appellant.

The record reveals the following evidence. The prosecutrix under the first count was an unmarried girl, who had been keeping company with a young man with whom, as their acquaintance progressed, she had had sexual intercourse. Her menstruation ceased about June 1, 1941. The prosecutrix discussed this situation with the young man in question. The prosecutrix told the young man she had gone to a doctor and that she was pregnant. The young man, one Dickson, told her that he knew a doctor's name. The prosecutrix and Dickson discussed the matter numerous times, and Dickson also said he knew of a prescription that would cause a miscarriage. Dickson also suggested an abortion, but the prosecutrix did not want to submit to such a treatment. However, Dickson gave the prosecutrix the name of appellant Vremsak and an address on Hollywood Boulevard; and on September 13, 1941, the prosecutrix went to an office on the second floor at this address. On the door of the office were the names of a Dr. Stevens and appellant Marineau. Appellant Marineau was a chiropractor. At this time the prosecutrix had been having "morning sickness" for about three weeks, and had been gaining weight. She stated that her purpose in going to the office in question was "to have an operation." The prosecutrix entered the reception room of the office suite in question and was there greeted by appellant Vremsak. The prosecutrix stated that she was the girl that had an appointment for one o'clock. Appellant Vremsak then took the prosecutrix into another room which contained what appeared to be an operating table and a sort of covered closet that had instruments in it. There was also a sterilizer in the room. The prosecutrix removed her underclothes at appellant Vremsak's direction; and the appellant placed the prosecutrix upon the operating table. Appellant Marineau then came into the room and examined the prosecutrix. After the examination the prosecutrix went into another room with appellant Vremsak. According to the testimony of the prosecutrix, appellant Vremsak there told her that the prosecutrix was approximately "three months along" and that she would have to be packed; and that if she and Dickson would come over to appellant's home that evening, appellant Vremsak would discuss the details and the financial aspects. Appellant Vremsak gave the prosecutrix appellant's name and ad-

dress, written on a slip of paper, together with home phone and office phone. That evening the prosecutrix and Dickson went to the address given, an apartment. Here Miss Vremsak told them the prosecutrix was three months along, would have to be "packed" and that the fee would be $100, $75 for the operation and $25 for the nurse and other expenses. Appellant Vremsak made an appointment for the prosecutrix to come to the office again the following Monday. On the afternoon of September 15th the prosecutrix went alone to appellant Marineau's offices. There appellant Vremsak put the prosecutrix in a surgical gown and assisted her on to the table as on the previous occasion. Appellant Marineau came into the room and inserted certain instruments into the private parts of the prosecutrix, who testified that she could feel the instruments and that they caused her great pain. This operation took about fifteen minutes. After it was over appellant Vremsak helped the prosecutrix off the table and took her into another room where she lay down until about 4 o'clock in the afternoon. While the prosecutrix was lying in that room appellant Vremsak came in and asked her for the money. The prosecutrix then handed appellant $70. Miss Vremsak then took the prosecutrix to Miss Vremsak's apartment where they were joined by another woman, who, the appellant stated, was the nurse who was going home with the prosecutrix. A little later Dickson came to the apartment and took prosecutrix and the nurse to the prosecutrix' apartment. The nurse stayed with the prosecutrix that night and all the next day, when the nurse removed from the prosecutrix what appeared to be a strip of gauze about an inch wide and about 2½ feet long. On Tuesday the prosecutrix went again to Miss Vremsak's apartment and from there to an office on Santa Monica Boulevard, where appellant Marineau again inserted instruments similar to the ones used before, causing prosecutrix a great deal of pain. Miss Vremsak was present and assisted as before. The prosecutrix was on the operating table about ten minutes. Afterwards, Dickson took the prosecutrix home. That night a flow began, and the prosecutrix remained in bed until the following Saturday. About Thursday after her return from appellant Marineau's office a foul discharge set in, which grew worse. On Saturday the prosecutrix again went to see Dr. Marineau, accompanied by her brother. Miss Vremsak was present. At this time appellant

Marineau took the prosecutrix' temperature, said she had the "flu" and gave her an injection in the hip and some capsules. The prosecutrix again visited appellant Marineau's office the following Tuesday, September 23rd. Miss Vremsak was present. At this time, while the prosecutrix was waiting for Dr. Marineau, her nose began to bleed. Appellant Vremsak placed the prosecutrix on the operating table and appellant Marineau again examined her by means of the instruments he had used before, or similar instruments. The prosecutrix suffered much pain during this examination. Dr. Marineau also gave the prosecutrix a hypodermic injection, which he said was calcium. This was while the prosecutrix was lying on a couch after the treatment or operation on the table. Then appellant Vremsak brought in the prosecutrix' brother. The following Saturday, September 27th, the prosecutrix again visited Dr. Marineau's office, accompanied by another brother. Appellant Marineau took the prosecutrix' temperature and told her if she would eat a lot she would be all right. However, the condition of the prosecutrix had been growing progressively worse; and on that Saturday afternoon, September 27th, the prosecutrix went to her family's ranch in Chino, California. Here she was examined by the family physician, a Dr. Hermann, after which she was removed to a hospital, where she was operated upon October 11th, and remained in the hospital until November 1st. The prosecutrix stated at the time of the trial she was still under the doctor's care. She testified that up to the time of her first visit to appellant Marineau she was in good health and knew of no reason why she could not have a baby.

Dr. Hermann, the family physician, was called as a witness. He testified that on the occasion of his first examination of the prosecutrix he found her abdomen and pelvis exceedingly rigid and tender throughout. The prosecutrix was pale, quite thin, had a rapid pulse, her skin was hot and dry and there was a foul odor in the room. The doctor advised immediate hospitalization and at the hospital upon examination he found a foul greenish vaginal discharge. A visual examination showed the cervix and vaginal walls to be bluish in color. The cervix showed evidence of what the doctor stated he thought at the time to be an old laceration. The cervix was dilated between a half and one centimeter. The laceration in question was on the right side of the cervix, about midway from the top to the bottom. After certain cul-

tures and a complete examination, together with prosecutrix' history, the doctor diagnosed the cause of her condition as a septic operation, meaning an infected operation, involving inflammation of the female organs of the pelvis. Upon operating, an abscess was found in the pelvis. The doctor stated that the prosecutrix was suffering from what is commonly called peritonitis. Upon the basis of the examination and the cultures taken, it was the doctor's personal opinion that prosecutrix was not infected with gonorrhea. Aside from the acute condition which he found, the doctor saw nothing in his examination and treatment of the prosecutrix which would have interfered in any way with her having a normal childbirth.

The testimony of Robert Dickson, the young man above referred to, was consistent with that of the prosecutrix. He also testified that during the time he was having relations with the prosecutrix, or any time thereafter, or at any time after he met her, he did not have gonorrhea. Instruments which the prosecutrix identified as resembling those appellant Marineau inserted in her vagina were put in evidence.

The prosecutrix under the second count of the information testified that she was a married woman living with her husband and having normal marital relations with him. She was 42 years old. Prior to October 6, 1941, she had missed her menses and believed herself to be pregnant. In the morning of October 6th her husband drove her to the offices of appellant Marineau in Hollywood. The prosecutrix testified that her purpose in going there was to find out if she were pregnant, and if she were she wanted to have an operation. When the prosecutrix entered the reception room of appellant Marineau's offices, she was met by appellant Vremsak who told her to wait for the doctor. Later appellant Marineau called the prosecutrix into the room and there the prosecutrix told appellant Marineau that she thought she was pregnant and wanted to know if anything could be done for her. Her statement in this regard was: "I told the doctor that I believed I was pregnant, and I asked if anything could be done, and he said he would help me." Appellant Marineau told her she would have to pay $55. Thereupon the prosecutrix got the money from her husband and gave it to appellant Marineau. The prosecutrix then went into another room as directed and put on a surgical coat, then placed her-

self on a table. Appellant Marineau came in and told her he was going to give her an injection in the arm, and did so. The prosecutrix then lost consciousness. When she regained consciousness she was lying on a bed in the room where she had undressed. She heard a "lot of noise" and got up and called for the doctor, whereupon some men came into the room together with a woman deputy sheriff. The men were also deputies, the arresting officers in this case. The prosecutrix was placed on a stretcher and removed to the Hollywood Receiving Hospital, where she was examined by a police surgeon, who testified as a witness for the prosecution. The surgeon found the prosecutrix pale, and her pulse was rapid. She complained of being a little faint and dizzy. She had a small puncture wound in the bend of the elbow, her abdomen was held firm, rendering the pelvic examination unsatisfactory. There was a string hanging from the vagina and some free drainage of blood, but no clots. On inserting a speculum the surgeon noticed the string was attached to a cotton tampon lying within the vagina, and there was a slight amount of free blood. After withdrawing the tampon the blood was noted to be coming from the cervix, the mouth of the uterus. The cervix appeared to be somewhat soft. There were no decidual tissues. There was a slight dilatation of the cervix. What little blood there was in the cervix was noted to be of a slightly bluish tinge, which the surgeon stated accords with the appearance of a uterus that is pregnant. The surgeon also stated that softness of the uterus is one of the early signs of pregnancy. The surgeon also stated that the appearance of the prosecutrix' cervix indicated that it could have had some instrumentation three or four hours previous to the surgeon's examination.

On October 6, 1941, Cora Elvin McMaster, a secretary for the Board of Medical Examiners of the State of California, telephoned the office of Dr. Henry Stevens in Hollywood, and in testifying at the trial herein, related the following phone conversation with a woman who gave her name as Miss Wilson, the name used by the appellant, Mabel Wilson Vremsak.

"I asked for Dr. Stevens, if Dr. Stevens was in, and she said no, and I asked if he would be in, and she said he would not, and she wanted to know if I was answering an ad or had been referred by someone. I told her I had been referred. And she wanted to know what I wanted to see him

about. I didn't answer immediately, and she didn't question me any more about that. She said, 'Is it one of those things?' And I told her it was. And she wanted to know if—no, she asked me first when I had menstruated last. I told her five weeks before. She wanted to know if I could come that afternoon, and I told her I wanted to come that morning, and she wanted to know if I wanted the work done or just wanted an examination. I told her just an examination. She said, 'If you are sure you are that way an examination will not be necessary.' So she said, 'Come at 11:30,' and she asked me if my informant had told me anything about the price, and I told her she had not. She said to see her first, that she was Miss Wilson, and she could make me a price of $50, and then when I went to see Dr. Marineau I wouldn't need to say anything to him about the price." The Miss Wilson on the phone also told Miss McMaster that Dr. Stevens referred his work to Dr. Marineau.

Cloisea Harmon, a deputy sheriff of Los Angeles County, one of the investigating officers in the case, testified that she went to the office occupied by appellant Marineau shortly after noon on October 6, 1941, and upon her arrival was met by the appellant Vremsak. She went in in company with a Mr. Anderson, a special agent of the Board of Medical Examiners. Appellant Vremsak was told that Miss Harmon's name was Miss Masters, the name used by Miss McMaster on the telephone, and that she had an appointment with the doctor. In a few minutes Miss Vremsak returned and told Miss Harmon to come in alone. Miss Harmon went through a small office into a treatment room and was told to undress. While Miss Harmon was undressing she asked Miss Vremsak if Dr. Stevens was there. Miss Vremsak stated that Dr. Marineau is "doing them now" and that Dr. Stevens had practically quit "doing them." After Miss Harmon was placed on a table for examination, appellant Marineau came in and examined her. Before examining her appellant Marineau asked "What makes you think you are not pregnant?" Miss Harmon replied, "I didn't tell you I wasn't pregnant. I am pregnant." Appellant examined her and then said, "Yes, you are eight weeks." Miss Harmon testified that at the time of the examination she had not missed any of her menses. As soon as the examination was over Miss Harmon sat upright on the table with a sheet around her and Mr. Anderson and Deputies Carmack, Hutchinson and Bowers of

the sheriff's office came into the room. When the officers came into the room appellant Vremsak started to run and Miss Harmon grabbed at her and one of the deputies told appellant she was under arrest. According to Mr. Anderson's testimony, Dr. Marineau also started to run. Miss Harmon then went to dress and saw Mrs. Stein, the prosecutrix under count two, in the adjoining room. Miss Harmon made a preliminary examination of Mrs. Stein and found a string outside the region of her vagina. Miss Harmon's testimony was corroborated by Mr. Anderson, the special agent for the State Board of Medical Examiners.

Various instruments and supplies taken from Dr. Marineau's office were identified and put in evidence. Included among the instruments was a forceps and a vaginal speculum. There was also a box of tampons with strings on them. The police surgeon testified that the instruments in evidence are those usually in a hospital where dilatation and curettage is performed. Dr. Hermann identified one of these instruments as a double curved forceps sometimes used to remove the contents of the uterus after the cervix is dilated.

The appellant Marineau took the stand in his own defense and testified regarding the several visits made by Miss Shirley, prosecutrix under count one, and stated that he was a chiropractor. He testified that he examined Miss Shirley for a vaginal discharge, and that the only instrument he used on her was a speculum, an instrument for vaginal examination. He denied using any instrument upon her with the intent or for the purpose of procuring a miscarriage. In reference to count two, appellant Marineau testified that Mrs. Stein, the prosecutrix, came in to see him and told him that she had missed a period; that she was in the habit of missing periods, but this time for some reason or other she felt rather strange and was suspicious of the fact that she might be pregnant. She also gave him a history of gall bladder trouble. Dr. Marineau testified that Mrs. Stein asked him how much it would cost for tests and treatment and that he was unable to give her the amount at the time; but that Mrs. Stein made a down payment of $55. Dr. Marineau stated that he made a bi-manual vaginal examination of Mrs. Stein; that he also inserted a vaginal speculum and took an ordinary dressing forceps and probed in the cervix to see if he could dislodge any disintegrated tissue cells, which he stated to be a common examination for patients that are suspected of cancer in the

cervix. He stated that he found the tissues apparently healthy, though probably a little more soft than usual. He also testified that after the examination Mrs. Stein appeared to have some kind of an attack with a fast pulse and shallow respiration, so he gave her a respiratory stimulant by hypodermic injection in the vein and that he used no instruments upon her of any kind to procure an abortion or miscarriage. Under cross-examination Dr. Marineau admitted that as a chiropractor he was not allowed to use any surgical instruments whatever; that he did not have the right to possess a hypodermic needle or syringe; and that he was not allowed to use any narcotic drugs, hydrated or otherwise. When shown invoices in his name for the purchase of curettes, forceps, needle holder, tampons, syringe, etc., Dr. Marineau stated that during his association with Dr. Stevens appellant Marineau did all the buying of supplies and surgical instruments and equipment that they used in both offices; that due to his personal dealings with the salesman he purchased some of them in his name.

The appellant Mabel Wilson Vremsak took the stand in her own defense and testified that she was employed by appellant Marineau as office assistant. She testified regarding the various visits of Miss Shirley to the office, admitted the visit of Miss Shirley with Dickson to appellant's apartment, but explained it by saying that Miss Shirley was "embarrassed to talk to the doctor" and would rather talk to appellant Vremsak and asked if she could see appellant at her home. Appellant Vremsak also admitted taking Miss Shirley to appellant's apartment on the occasion after Miss Shirley was treated, and explained the nurse's going to Santa Monica with Miss Shirley by the following testimony: " . . . there was an acquaintance of mine dropped in and inquired about Dr. Dowley, a doctor that I used to work for, that had passed away—a former patient of his dropped by and asked me about him, and the conversation came up that she had friends in Santa Monica, and when she found out they were going to Santa Monica, she asked if she could go along with them; and what they did after that, I don't know." In reference to count two appellant Vremsak admitted that she acted as receptionist when Mrs. Stein came into the office but stated she did not know what took place after that. On cross-examination appellant Vremsak admitted she was not a regis-

tered nurse and had no specialized training as a nurse of any kind. Miss Harmon, the deputy sheriff, testified that on the way down to the Hall of Justice she had a conversation with appellant Vremsak during which Miss Vremsak appeared to be upset and said she was sorry she got into this trouble and said she didn't want any pictures taken. Miss Harmon also testified that while she was watching Dr. Marineau in his office she said to him, "Why wouldn't you stick to your own line of work?" and he replied, "Are you feeling sorry for me?"

The foregoing résumé of evidence is enough to show the sufficiency thereof and to dispose of all contentions relating thereto. Both appellants admitted their connection with the treatment of Miss Shirley; and the medical testimony, together with exhibits introduced and other circumstantial evidence, was sufficient to corroborate the testimony of any accomplice, even assuming the young man in question to have been an accomplice. As to count two, the evidence is equally sufficient and corroborative. Though appellant Vremsak was not present when Mrs. Stein was treated, her connection with appellant Marineau and the part appellant Vremsak was shown to have played in Dr. Marineau's practice was sufficient to remove even the possibility of a doubt as to her guilt. An additional circumstance bearing upon the question of appellants' guilt was the testimony as to their attempted flight at the time of their arrest.

█ As to evidence of other acts and offenses, the situation here presented is no different in principle from that in *People v. Coltrin*, 5 Cal.2d 649 [55 P.2d 1161], which case furnishes a complete answer to appellants' contention in this respect, as well as to the contention regarding admission of the testimony of Miss Harmon, the deputy sheriff.

█ Appellants complain of the admission of testimony given by Miss Harmon as to statements made by a Mrs. Howard in the presence of appellants as to the treatment of Mrs. Howard by Dr. Marineau. This testimony was admitted for the limited purpose of showing an accusatory statement not denied by the defendants; and the jury was instructed as to the purpose for which such statements are admitted in evidence. The statement made by the woman in question was to the effect that she was about eight weeks pregnant and that she had made an appointment with Marineau's associate for an operation; that she had paid $55 therefor to Dr. Mari-

neau, asked him for a receipt and he said he did not give receipts; that appellant Marineau gave her a shot and she went out completely; that she returned to appellant's office a week later and appellant Marineau examined her and said the operation was a success; and that she had not menstruated at the time she came to the office. After this story had been related in the presence of appellants, one of the officers present asked appellant Marineau if he had anything to add to the statement and appellant shook his head in the negative. Miss Harmon could not recall whether appellant Vremsak made any comment or reply. The effect of the statement made by Mrs. Howard was plainly that of accusing appellant Marineau of having committed an abortion upon her; and appellant Marineau, when asked if he had anything to add to the statement, replied by a negative sign, thus failing to deny the statement with which he was confronted, though given an opportunity to do so. It is true that the statement constituted an accusation of an offense other than the one with which appellant was charged; but the offense of which he was thus accused was one of which evidence could have been offered to show appellant's intent in committing the acts charged against him. (*People* v. *Coltrin, supra.*) In *People* v. *Hagenow,* 236 Ill. 514 [86 N.E. 370], a prosecution for murder by performing an abortion, resulting in death of the woman upon whom it was performed, the dying declaration of another woman suffering from the results of an abortion, which declaration was prepared, signed, and read aloud in accused's presence several years previously, the accused making no denial of the facts stated, to the effect that the accused had produced the abortion, was held admissible, not as a dying declaration, but as an admission of accused to show her connection with that woman's death. The situation there presented is identical in principle with that presented here. Since evidence of the acts performed on Mrs. Howard was admissible to show the intent with which appellant performed the acts charged, it was proper to introduce in evidence an admission of the acts performed on Mrs. Howard. Such a rule is neither contrary to nor inconsistent with the principles enunciated by this court in *People* v. *Dryden,* 76 Cal.App. 525 [245 P. 436]. There, in a prosecution for driving while intoxicated, the trial court had permitted the introduction in evidence of a conversation had by a police officer with the

defendant, in which the police officer accused defendant of having been arrested before for the same offense and of having been previously arrested for being drunk, and stated that defendant had not learned his lesson then. In the Dryden case this court stated that the rule regarding accusatory statements should not be extended to a point which would permit the introduction of any and all statements made by the arresting officer to a defendant under the guise of noting the replies or the attitude of the defendant; and that the law forbids that to be done indirectly which may not be done directly. It should be noted that in the case at bar evidence of the offense against Mrs. Howard might have been directly introduced. The situation here is also distinct from that in *People* v. *Hartwell;* 37 Cal.App. 799 [175 P. 21]. The statement made by Mrs. Howard falls well within the bounds set by *People* v. *Dryden, supra.* Under the circumstances, insofar as appellant Marineau is concerned, this statement by a patient was sufficient to constitute an accusatory statement and there was no error in its having been admitted for that purpose, in view of the instruction given the jury. As to appellant Vremsak, it does not appear that any effort was made to limit the effect of the statement to appellant Marineau. ▉ Obviously, it could not have been used as an admission against appellant Vremsak since it does not appear that she failed to deny it or make any reply, nor does the statement constitute an accusation against her. However, in view of the record presented, the admission of the statement in question could not be held to have resulted in prejudice to appellant Vremsak.

▉ Appellants complain of an instruction given the jury which set forth the provisions of section 7 of the Chiropractic Act and section 11476 of the Health and Safety Code of California. Section 7 of the Chiropractic Act provides that the license to practice chiropractic in the State of California shall not authorize the practice of medicine, surgery, osteopathy, dentistry or optometry, nor the use of any drug or medicine now or hereafter included in materia medica. (Stats. 1923, p. xc; Deering's Gen. Laws, 1937, Act 4811.) Section 11476 of the Health and Safety Code provides that no person other than a physician, dentist, osteopath, chiropodist, registered nurse, veterinarian, or pharmacist, shall have in his possession a hypodermic syringe or hypodermic needle, or any instrument or contrivance used for the same purpose, unless it was

purchased by the person with a written order signed by a physician, dentist, chiropodist, veterinarian, or osteopath. (Stats. 1941, ch. 1116, p. 2819.) The instruction then continued as follows: ''If you should find from the evidence that defendant Marineau, at the times charged in the information, was a duly licensed chiropractor but was not a physician and surgeon, dentist, osteopath, chiropodist, registered nurse, veterinarian or pharmacist, and at said times used or had in his possession under circumstances indicating to you that he had used surgical instruments or administered hypodermic injections of drugs upon Reva Shirley or Estelle Stein, then this is a circumstance which you may take into consideration in determining the intent with which he treated said persons, if you find that he did so treat them.''

Appellants contend that no such deduction could be made from such evidence. But possession of instruments and equipment enabling a defendant to perform an abortion is a circumstance which may be considered by a jury. (*People* v. *Watanebe*, 91 Cal.App. 290, 293 [266 P. 1000].) ''The surgical instruments were admissible in evidence as bearing upon the question of the intent with which the medicine was administered [cases cited]. Said instruments were found in appellant's possession at the place where the crime is alleged to have been consummated; and despite the admitted fact that the miscarriage of the prosecutrix was sought to be accomplished by administering medicine, it may be fairly inferred from the testimony showing the nature of the instruments and the use to which they are put, that their use would have been probable in the subsequent treatment of the prosecutrix if she had continued to remain under appellant's care.'' (*People* v. *Lee*, 81 Cal.App. 49, 54 [252 P. 763].) Appellant Marineau, as a chiropractor, was not authorized to use surgical instruments or hypodermic needles. The use of such instruments upon the persons he treated was properly considered in determining the intent with which those persons were treated, and the instruction of the court to that effect was correct.

Appellants complain of an instruction in which the court merely gave a definition of the term ''chiropractic.'' Appellants' contention is that the giving of this instruction placed improper emphasis upon the fact that Dr. Marineau was a chiropractor. But the fact that Dr. Marineau was a chiropractor was a circumstance to be considered by the jury in

determining the intent with which he treated the two women in question by the use of hypodermics and surgical instruments. A definition of the term "chiropractic," by which the jury would be apprised of the proper scope of the practice of the profession of chiropractor, served as a necessary guide to the jury in the determination of the intent with which appellant performed the acts in question. Such an instruction would not have the effect, as contended by appellants, of affording a chiropractor less protection when charged with a crime than that afforded a doctor of medicine. On the contrary, the giving of an instruction defining the scope of the practice of chiropractic served to place appellant on the same footing with any medical doctor charged with a crime involving an improper practice. As pointed out by respondent, the fact that appellant was not qualified to possess or use instruments and apparatus commonly used in producing abortions was a fact that could be considered by the jury as a circumstance in determining the intent with which appellant treated the two women.

Appellants also contend that the trial court erred in admitting the testimony of the police officers regarding certain money found in appellant Marineau's office, and with regard to other similar matters. However, the evidence already set out above was ample on which to convict appellants and a discussion of the materiality or immateriality of the testimony here referred to would serve no purpose, since appellants cannot be held to have been prejudiced by the same.

■ There appears on file herein a certified copy of an order of the superior court made August 28, 1942, exonerating the bond of defendant Vremsak on appeal, which order reads as follows: "It appearing to the court, from the certificate of death on file herein, that said defendant is dead and on motion of William G. Kenney, counsel for the Surety Company, the bond on appeal is exonerated." However, the mere filing of a certified copy of such an order is not sufficient to constitute a suggestion of the death of the party, on which to abate the cause on appeal.

For the foregoing reasons the order denying the motions for a new trial and the judgments of conviction are affirmed.

York, P. J., and White, J., concurred.