[Crim. No. 4141. Second Dist., Div. Two. Feb. 18, 1948.]

THE PEOPLE, Respondent, v. MAY RAMSEY, Appellant.

Morris Lavine for Appellant.

Fred N. Howser, Attorney General, Frank Richards, Deputy Attorney General, W. E. Simpson, District Attorney, Jere J. Sullivan and Robert Wheeler, Deputy District Attorneys, for Respondent.

WILSON, J.—Appellant and Winifred Howard were charged with two counts of abortion and appellant was charged in addition with three prior convictions of felonies, one being for conspiracy to commit abortion and the other two for abortions. Both defendants pleaded not guilty; appellant admitted the three prior convictions charged against her.

Upon the conclusion of the introduction of evidence count 1 was dismissed for lack of sufficient evidence, the complaining witness not having appeared at the trial, and the jury was instructed to disregard the evidence offered concerning that charge.

The jury returned a verdict of guilty against appellant as charged in count 2 and failed to agree on a verdict as to defendant Winifred Howard.

Appellant was sentenced to imprisonment in the California Institution for Women for the period prescribed by law. She has appealed from the judgment and as grounds for reversal has raised four issues: (1) Insufficiency of the evidence to sustain conviction; (2) alleged errors in the admission of evidence; (3) alleged misconduct of the dis-

trict attorney; (4) refusal to give instructions requested by appellant.

1. *The sufficiency of the evidence.* An outline of the evidence will demonstrate that it was ample to sustain the conviction.

The complaining witness, who will be referred to as "Anne," testified that her residence was in Los Angeles and that on October 29, 1946, the date on which the crime was committed, she was in good health but that she was pregnant and not menstruating; about September 28 or 29 previously she felt that she was pregnant because she at that time had missed one menstrual period; she had missed another period just prior to October 29; for seven or eight years she had menstruated regularly every 28 days; on October 29, she went to Wilmington where she was "picked up" by a girl named Lois (last name unknown to the witness), who took her to the residence of appellant. Lois drove the witness alongside the house, which she entered through the back door, not meeting anyone until she was inside. After she was seated in the den Mrs. Howard, appellant's codefendant, had a conversation with her, asking the time of her appointment, to which Anne replied that it was for 12 o'clock. Mrs. Howard asked Anne if she had the money with her, to which she answered "Yes," and handed Mrs. Howard $150. Mrs. Howard then left the room and on her return gave Anne two green pills and one yellow pill which she swallowed at the direction of Mrs. Howard. Anne remained seated and in a short time began to feel slightly "groggy." The witness was shown a green vial containing some yellow pills and a large bottle labeled "Skphengel No. 2, 1000 Tablets" containing green pills and stated that the pills of both colors were similar to those that were given to her. The vial and the bottle, containing pills similar to those described by the witness, were later identified as having been found by the officers in appellant's residence.

Mrs. Howard conducted Anne to a bedroom where she remained for 25 or 30 minutes lying down. There was another girl in the room on another bed. Anne was then taken into the kitchen by Mrs. Howard and was instructed to lie upon a white table, which she did. There were stirrups on the end of the table, one on each side. Anne was lying on her back with her feet in the stirrups and her legs were spread apart. She saw appellant at that time, the latter being be-

tween Anne's legs. Anne closed her eyes; she felt something inserted into her private parts and felt someone touching them but did not know what was used; she heard a "vacuumy" sound—"kind of a suction," something like a carpet sweeper but not quite so loud; she was on the table about 20 minutes with appellant between her legs; she was taken back to the bedroom by Mrs. Howard; she was put to bed where she stayed for over an hour. Mrs. Howard gave her an injection which she said was penicillin, also gave her some pills to be taken later on—not that day. Anne was still in bed at the time the officers arrived.

After they arrived Dr. Nichols, who is licensed to practice medicine in California and who at that time was a resident physician in obstetrics and gynecology at the Los Angeles County General Hospital, made a bimanual examination of Anne; she was bleeding at the time and told the doctor that she thought an abortion had been performed upon her.

Dr. Nichols testified concerning the examination made by him and stated that as a result of the examination his impression was, at that time, that this was a pregnant uterus of approximately six weeks and that there was some bleeding from the uterus, suggesting that she was possibly threatening to abort or could have already aborted. The condition he found could have led to either diagnosis. He stated that a threatened abortion is one where the abortion has not taken place—the fetus is still in the uterus at the time of the threatened abortion. About two weeks later he again examined Anne at the General Hospital and found that her uterus was about half the size that it was at the time of his previous examination.

An investigator from the district attorney's office, on the date on which the offense is alleged to have taken place, found in appellant's home a notebook in a cupboard beside the telephone. In the book was the notation "Tues 29" and on the back of the same page "12 00 Ann ——," giving her full name, her address in Los Angeles and telephone number.

On the same day Mrs. Harman, a deputy sheriff, in the course of her duties went to the house in which the offense had taken place, where she saw appellant and said, "Hello, Mrs. Ramsey," and the latter said, "What? You here again?" On the evening of the same day Mrs. Harman had a conversation with appellant in the district attorney's office. At that time Anne was passing them with one of the

officers. Appellant said, "Poor thing, I feel sorry for her." Mrs. Harman asked appellant why she was doing these abortions, to which the latter replied, "Well, I was supposed to quit two weeks ago, and Wally had asked me to sever all relations with Dr. Buffum at a particular time." Mrs. Harman then asked if she didn't have enough money without resorting to such things. "No, I haven't," appellant replied, and made the further statement, "I certainly have been shaken down in this blackmail." Mrs. Harman asked by whom, and appellant replied, "Well, I didn't talk before and you know I won't talk this time." Mrs. Harman then asked if appellant didn't think a holdup that she had reported to the sheriff's office had been by someone trying to get money back from some of the abortions, and appellant said, "Yes, I think so; there's been a lot going on; you'd be surprised if you really knew, Mrs. Harman."

There was evidence that appellant was not registered in California as a licensed physician and surgeon or as a chiropractor.

The property on which the offense was committed was assessed in the name of Leola M. Ramsey.

Mr. England, a deputy sheriff, arrived on the premises with several other officers, where he saw appellant and her codefendant in the hallway and found Anne sitting on a davenport in the den. He heard Mrs. Ramsey say to another officer, "I am glad that you called on me, boys; I have been working very hard lately, and I need a rest." England asked her where were her tools, to which she replied that they were probably in the garage. He said, "I don't mean that kind of tools. You mind if I look around a bit?" Mrs. Ramsey said, "Help yourself." Mr. England identified a flour sack containing a number of surgical instruments which he found in a cupboard connected with the kitchen. The sack when he found it contained rubber tubing, a hypodermic syringe and 19 nickel plated or chromium instruments of different types; also several metallic objects appearing to be holders for hypodermic needles. In addition to the instruments England also found various bottles. He said to appellant, "What about these? This is what I meant." Appellant said, "Can you imagine that?" Nothing further was said. England also found the white table and the stirrups which Anne described in her testimony, the latter being in a cupboard approximately 10 feet from the table. England

also found in the kitchen cupboard a suitcase containing pieces of bark, an instrument with rubber tubing attached, an instrument similar to a large pair of scissors, and a small pair of scissors. He found numerous vials, boxes and bottles in various cupboards in the kitchen, more in the icebox, one of the bottles being labeled "Penicillin"; a carton labeled "Sodium Squibb" containing three small bottles, and three small cartons labeled "300,000 Units." There were also rolls of cotton, two boxes labeled "Flexible Kone Pessary, Medic Supply Company," a pair of rubber gloves, five or six boxes labeled "Mercurophen," a large bottle labeled "Quinine Sulphate," a green vial containing yellow capsules, a package of Vim stainless steel hypodermic needles, and some Lily distilled water, 20 cartons marked "Novocaine," cartons labeled "Procaine hydrochloride," a can marked "Ether," a vial marked "Ergotrate, 1/320 gr.," a box labeled "Donnatal," grasping forceps, sponge holders, a uterine tenaculum, curettes, and various other instruments.

Dr. Newbarr, who received his medical degree in 1917, and had been licensed to practice in California in 1933, testified that he had done obstetrical work for about 11 years. At the time of the trial he was chief autopsy surgeon of Los Angeles County. He was shown the various instruments, bottles, and other containers that had been found in appellant's premises. He testified that he was familiar with the various pharmaceuticals mentioned on the labels of the bottles and other containers; that some were ordinary drugs used in the practice of medicine, some were sedative, some analgesic, and some were stimulating. He stated that the administration upon a female person of Anne's age of one yellow tablet and two green tablets such as were administered to her would have a sedative and more or less pain-relieving effect—in lay language, the person would be made "groggy." He testified that penicillin is used to combat infection; mercurophen is a germicide often used in sterilization; rubber gloves are used in surgery in an effort to keep the hands sterile; procaine hydrochloride induces local anesthesia—it is a little stronger than novocaine; ether is a general anesthesia; salt solution is used as treatment for a shock, principally intravenously; a flexible kone is a type of stem pessary which is not used any more; it was once thought that it had a value in correcting the position of the uterus when inserted into the cervex; if it were inserted as a foreign body it would

set up uterine contractions; its effect would be nature's effort to expel whatever is in the uterus; ergotrate sets up contractions of smooth muscle tissue, such as the uterus, and the quinine sulfate stimulates such tissues; the stirrups are attached to an examining table and the patient's heels are placed in the stirrups for the purpose of making a vaginal examination; this would be the logical position in which to place a person for the purpose of performing an abortion; a speculum is used in any vaginal surgery; a cervical dilator is used for dilating the cervex previous to any operation on the uterus and could be used in performing an abortion; the tenaculum likewise can be used in performing an abortion; the rubber tubing is attached to a faucet and has an aspirating effect, meaning suction. Other various instruments found on the premises were described by Dr. Newbarr as those used in the performing of abortions.

Anne had testified that she did not know whether or not she had passed the fetus. Dr. Newbarr testified that "when an abortion occurs the fetus doesn't pop out as a separate unit. There is an expulsion of clots, tissue, fetus, the embryonic sac, all in one ball you might say." He stated that in the hospital all parts of the expelled matter are retained and the clots and tissues are separated with an instrument in order to find the fetus.

The foregoing evidence stands uncontradicted. Neither appellant nor Mrs. Howard testified at the trial and neither of them offered any evidence in their defense.

We need not engage in speculation or conjecture as to what was done or who did it. When Anne was lying on the table she saw appellant sitting between her legs; she felt an instrument within her vagina and heard a "vacuumy" sound. It would be the height of absurdity to assume, as suggested in appellant's brief, that while appellant was occupying that position some other person performed the operation.

That Anne went to appellant's residence for the purpose of having an abortion performed is demonstrated by these facts: (a) She placed a telephone call while at her home in Los Angeles; (b) she was met at the railroad station by a girl who was unknown to her and was taken to appellant's home; (c) Anne was asked by Mrs. Howard if she had the money and she produced $150; (d) there was no conversation as to the purpose of her visit or as to the price she was to pay, indicating that arrangements concerning both matters had

been made previously; (e) the notebook found in the closet bore Anne's name, address, telephone number, and the hour of her appointment.

■ *Corpus delicti.* Anne's testimony is sufficient to establish the corpus delicti if it is adequately corroborated by competent facts, circumstances or reasonable inferences to be drawn from the evidence. (*People* v. *Thompson,* 69 Cal.App. 2d 80, 85 [158 P.2d 213].)

■ *Corroboration.* While a person cannot be convicted of the crime of abortion upon the testimony of the woman upon whom the offense was committed unless she is corroborated by other evidence (Pen. Code, § 1108) the corroborating evidence need not establish precisely the same facts recounted in the woman's testimony but it may consist of inferences from the circumstances surrounding the criminal transaction. (*People* v. *Collins,* 80 Cal.App.2d 526, 534 [182 P.2d 585]; *People* v. *Wilson,* 25 Cal.2d 341, 346 [153 P.2d 720]; *People* v. *Lorraine,* 28 Cal.App.2d 50, 53.)

■ The evidence of Dr. Nichols, to which we have referred, is a sufficient corroboration of Anne's evidence. (*People* v. *Pierson,* 69 Cal.App.2d 285, 299 [159 P.2d 39].) The statements made by appellant to the officers likewise furnish corroboration. (*People* v. *Garner,* 60 Cal.App.2d 63, 65 [140 P.2d 146].) Furthermore, the presence in appellant's home of a girl occupying a bed in the room in which Anne was placed, of the numerous instruments that are used in producing abortions, hypodermic needles and large quantities of sedative, pain-alleviating and sterilizing drugs, demonstrate that appellant was prepared to perform abortions and was no doubt operating an abortion "mill."

■ *Proof of pregnancy not necessary.* Since the amendment to section 274 of the Penal Code in 1935, it has not been necessary to prove that the woman on whom the operation was performed was pregnant at the time of the commission of the offense. (*Rinker* v. *State Board of Medical Examiners,* 59 Cal.App.2d 222, 224 [138 P.2d 405]; *People* v. *Emery,* 79 Cal.App.2d 226, 231 [179 P.2d 843].) The performing of the operation with the intent on the part of the accused person to produce or procure a miscarriage constitutes the offense even though the woman on whom the operation is performed is not in fact pregnant.

■ *Necessity to preserve life.* There is no intimation in the evidence that the operation was necessary to preserve

Anne's life. Nonnecessity may be shown by circumstantial evidence. (*People* v. *Malone,* 82 Cal.App.2d 54, 59 [185 P.2d 870].) It is uncontradicted that Anne traveled from Los Angeles to Wilmington alone and required no assistance in entering appellant's residence. There is no evidence that she had or needed any aid in walking or in attending to her affairs after the operation. In addition there is her evidence that she was in good health,—normal except for her pregnancy. Dr. Nichols found nothing wrong with her except that her condition indicated that she had been aborted or was about to abort. She had no medical attention for any purpose prior to the operation and none thereafter other than the examination by Dr. Nichols. This evidence, together with all the other evidence which we have outlined, is sufficient to establish that preservation of life was not the object of the operation. (*People* v. *Emery, supra; People* v. *Knowles,* 7 Cal.App.2d 398, 401 [46 P.2d 788]; *People* v. *Card,* 40 Cal.App. 22, 24 [180 P. 53]; *People* v. *Brewer,* 19 Cal.App. 742, 746 [127 P. 808].)

The undisputed and uncontradicted evidence which we have outlined establishes beyond a reasonable doubt every element necessary to constitute the offense charged. The facts are compatible only with the guilt of appellant and since they are not, as the court found to be the case in *People* v. *Murphy,* 60 Cal.App.2d 762, 772 [141 P.2d 755], "as compatible with innocence as they are with guilt" we need not give further consideration to that opinion. However, the statement in the Murphy case (p. 772) to the effect that if the corroborating circumstances standing alone, while generating a suspicion of guilt, are as compatible with innocence as they are with guilt, the corpus delicti of the crime is not proved, is a rule to be followed by the trier of facts but not by a reviewing court. As applicable to appeals it is contrary to the holding of the Supreme Court in *People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778], and in the cases there cited.

The Murphy case contains the further statement (p. 770) that unless the accused had "actual knowledge . . . of the pregnancy of the woman, or a belief . . . that [she] was pregnant" the required and necessary intent to procure her miscarriage could not exist. Proof of such knowledge or belief has not been necessary since the 1935 amendment to section 274 of the Penal Code which omits "pregnant" before the word "woman" formerly in the statute. (*People* v.

*Emery* and *Rinker* v. *State Board of Medical Examiners,*
*supra.*)

2. *Alleged errors in the admission of evidence.* (a)
Appellant's first asserted error has reference to the evidence
of Dr. Newbarr concerning the vials, cartons and other con-
tainers found in appellant's residence. The statement in
appellant's brief that he testified "as to the contents" of
bottles and other containers, without having analyzed the
drugs and without knowledge of their character, is not borne
out by the record. He was not asked and he made no state-
ment at any time concerning their "contents." In answers
to questions he⁰ repeatedly stated that he was reading the
labels on the containers and that his evidence was directed
solely to the effect that the drugs named on the labels would
have on a human being, and in particular the effect of some
of the drugs on a female of Anne's age and on a pregnant
woman. The pills which Anne described as having been
given to her and which made her "groggy" were stated by
Dr. Newbarr to be of a sedative nature.

There is a fair inference that such pills were "used in
the case" in the commission of the offense charged. There
is no evidence that any drugs given to Anne while she was
in appellant's residence came from any source other than
the bottles which she described. Appellant's possession of
these pills and of the other drugs was a circumstance which
the jury had a right to consider in determining her guilt or
innocence. (*People* v. *Marineau,* 55 Cal.App.2d 893, 907
[132 P.2d 22]; *People* v. *Pierson,* 69 Cal.App.2d 285, 298
[159 P.2d 39]; *People* v. *Gilman,* 43 Cal.App. 451, 455 [185
P. 310]; *People* v. *Scott,* 24 Cal.App. 440, 450 [141 P. 945].)

Since the bottles and other containers were found in appel-
lant's residence and the labels thereon designated drugs such
as might be used in committing an abortion they were prop-
erly received in evidence. (*People* v. *Salas,* 17 Cal.App.2d 75,
77 [61 P.2d 771].) It will not be presumed that appellant
had in her possession this vast array of containers, bearing
the labels which have been described, unless (1) they con-
tained the drugs designated on the labels and (2) she intended
to use the drugs in producing miscarriages and did so use
them.

(b) We find no error in the admission in evidence of
the surgical instruments found by the officers in appellant's
residence while she was present and at or near the place

where she had operated on Anne. They were such as are used in the commission of abortions. A sedative drug and an injection had been given to Anne and instruments had been used on her. When the instruments were shown to appellant her only remark was "Can you imagine that?" She did not deny ownership. The instruments were a part of the *res gestae.* (*People* v. *Sieber,* 201 Cal. 341, 353 [257 P. 64] ; *People* v. *Green,* 13 Cal.2d 37, 43 [87 P. 2d 821].)

There is no merit in appellant's argument that she was injured in the eyes of the jury because the instruments and drugs found in her home might have been used in the commission of the abortion for which she had been convicted in 1941—the prior convictions charged in the information. (1) Her admission of the prior convictions were made out of the presence of the jury and they had no knowledge of her past criminal record. (2) Her continued possession of the instruments and drugs after she had been released from her previous imprisonment is not compatible with her innocence. It is presumed that if she had intended to lead and had led an upright life after her former incarceration she would have disposed of the instrumentalities that no doubt assisted in her previous conviction. It is puerile to argue that it was necessary for the prosecution to prove that they had been procured by appellant since the commission of the prior crimes.

Notwithstanding appellant's repeated assertion that it was not shown that she touched Anne, the latter testified to the contrary and there was no attempt to contradict her evidence. It was not necessary to prove that any one of the instruments introduced in evidence was actually used in the commission of the crime. Anne testified that an instrument was inserted into her vagina; the instruments in evidence were such as are used in producing abortions; they were in appellant's residence when the crime was committed; they were found by the officers in appellant's presence; she offered no explanation of her possession of them. Need more be said!

For the reasons which we have stated the evidence of Dr. Newbarr concerning the instruments was properly admitted, hence there was no error in denying appellant's motion to strike out his testimony.

The cases of *People* v. *Hill,* 123 Cal. 571 [56 P. 443], and *People* v. *Muhly,* 11 Cal.App. 129 [104 P. 466], cited by appellant, are not abortion cases and are so factually dissimilar to the instant case that they need not be discussed except

to say that in neither case was any connection shown between the defendant and the object offered in evidence.

Since (1) these surgical instruments are of a character that may be used in the commission of an abortion, (2) were in the possession of appellant at the time of the offense, and (3) there is circumstantial evidence justifying the inference that they were so used, they are admissible in evidence against her even though there is no positive evidence that they were used on Anne. (*People* v. *Gilman*, 43 Cal. App. 451, 455 [185 P. 310].)

■ (c) The evidence of Cloisea Harman, a deputy sheriff, concerning statements made by appellant, was properly received. When Mrs. Harman arrived at appellant's residence she said, ''Hello, Mrs. Ramsey,'' and the latter said, ''What, you here again?'' At the district attorney's office Mrs. Harman asked appellant ''why she was doing these abortions.'' Appellant replied that she ''was supposed to quit two weeks ago.'' Objection is made to this evidence and also to the evidence of appellant's statements which we have related regarding a ''shake down'' and blackmail. This evidence is no more objectionable than that given in *People* v. *Coltrin,* 5 Cal.2d 649, 658 [55 P.2d 1161], where the deputy sheriff testified that when he went to the defendant's office and asked him to go to the district attorney's office the defendant asked why he was wanted; he was told that it was in regard to an abortion and he replied ''Which one?'' The court said that this was in the nature of an admission and tended to show a consciousness of guilt. In the instant case each of appellant's statements repeated by Mrs. Harman tended to show that appellant knew she was guilty of the offense for which she was under arrest.

(d) The further objection is made to the ruling of the court admitting Mrs. Harman's evidence that no force or violence was used on appellant and that no promise of immunity or hope of reward was held out to her. The objection to the evidence was on the ground that it called for a conclusion of the witness. The trial court did not err in admitting the evidence. ■ (1) Appellant's statements were not in the nature of a confession and it was not necessary to lay a foundation as to the voluntary character thereof. (*People* v. *Ramirez,* 113 Cal.App. 204, 207 [298 P. 60]; *People* v. *Hamby,* 55 Cal.App. 37, 40 [202 P. 907]; *People* v. *Peete,* 54 Cal.App. 333, 353 [202 P. 51].) ■ (2) The testimony of the

witness that the statements were voluntarily made was not a conclusion. (*People* v. *Bannon*, 59 Cal.App. 50, 59 [209 P. 1029].)

■ (e) Objection is made to the reception in evidence of a looseleaf notebook. Anne testified that in response to Mrs. Howard's question when she arrived she stated that her appointment was for 12 o'clock. She had been met at the railroad station at a time when she would arrive at appellant's residence at about that hour. The notebook was found in appellant's cupboard beside the telephone, a place where an appointment book is usually kept. The notation on the first page was "Tues 29." (The crime was committed on October 29.) On the back of the same page was "12 00" (the hour of the appointment) followed by Anne's full name, and a Los Angeles address and telephone number which she identified as hers. She also testified that before making her trip to Wilmington she had put in a telephone call. Immediately after her arrival at the time noted in the book she was aborted. The notebook had a direct bearing on the matter of appellant's having performed the abortion and was properly admitted. (*People* v. *Wade*, 71 Cal.App.2d 646, 655 [163 P.2d 59]; *People* v. *Stoerkel*, 87 Cal.App. 336, 339, 342 [262 P. 825].) It was not necessary to prove, as contended by appellant, how long the book had been in the cupboard, who placed it there, or who wrote the notations in it.

■ (f) A special agent of the State Board of Medical Examiners testified that he had access to the records of that board and to the list of licentiates of the osteopathic and chiropractic boards and that appellant's name did not appear therein as a registered physician, surgeon or chiropractor. On cross-examination he stated that he had not examined the records themselves but had looked at the last printed directories issued annually by those boards. They were issued in 1946. (The crime was committed in October, 1946.) Appellant moved to strike the evidence on the ground that no proper foundation had been laid and that it was a conclusion of the witness. The motion was denied. It is argued that the directory would be inadmissible as evidence and could not serve as a foundation for the testimony of the witness unless the person who compiled it had first identified it and had testified (a) as to the mode of its preparation, (b) that it was a correct compilation, and (c) that it had been made in the regular course of business.

The court did not err in denying the motion to strike. (1) The printed directory of the licentiates of each board is issued as an official document of such board. (2) The crime does not depend on whether or not the person committing it is licensed. Section 274 of the Penal Code provides that "*every* person" who performs any act described in that section with intent to procure the miscarriage of a woman "unless the same is necessary to preserve her life" is punishable etc. The crime is of no higher degree if performed by an unlicensed person than if by a regularly licensed practitioner. (3) If a license were necessary the burden was not on the prosecution to show that she did not possess one but was on appellant to prove that she held a valid unrevoked license. (*People* v. *Boo Doo Hong,* 122 Cal. 606, 608 [55 P. 402] ; *People* v. *Wah Hing,* 47 Cal.App. 327, 331 [190 P. 662] ; *People* v. *Fortch,* 13 Cal.App. 770, 775 [110 P. 823] ; *People* v. *Goscinsky,* 52 Cal.App. 62, 64 [198 P. 40] ; *People* v. *Saunders,* 61 Cal.App. 341, 345 [215 P. 120].)

 (g) On cross-examination Anne was asked whether she passed any fetus after the operation, to which an objection by the district attorney was sustained. Appellant contends that the ruling was error and that the question was essential to determine whether appellant could have had the requisite intent to commit an abortion and to test Anne's credibility concerning her statement that she was pregnant. The answer to this contention is twofold: (1) Pregnancy is not an element of the offense and the intent to commit an abortion is not dependent on the pregnancy of the woman on whom the operation is performed. (Pen. Code, § 274; *People* v. *Emery,* 79 Cal.App.2d 226, 231 [179 P.2d 843].) (2) Anne was not qualified to answer the question. The medical testimony is that when an abortion occurs a mass is expelled in one ball, consisting of clots, tissue, fetus and embryonic sac, and it is necessary to separate this mass in order to find the fetus.

 (h) Error is assigned to the ruling of the court permitting Anne to testify that her purpose in going to appellant's residence was to have an abortion. The purpose of the visit is directly connected with the crime and the evidence shows that such purpose was communicated to and known by appellant. Anne placed a telephone call before going to Wilmington; she was met by an unknown girl and was taken directly to appellant's home; the notebook showed

that she had an appointment at approximately the hour of her arrival; Mrs. Howard asked her the hour of her appointment and when she said that it was at 12 o'clock Mrs. Howard immediately gave her a sedative; appellant then performed the operation. There was no error in allowing the witness to answer the question.

 (i) The admission of a conversation between an officer and appellant regarding the bottles and instruments found in her home is assigned as error. One of the officers asked where her tools were. In an attempt at facetiousness in a serious situation appellant replied "Probably out in the garage." The officer said he was not looking for that kind of tools. When he found the instruments and bottles he asked "What about this?" Appellant said "Can you imagine that?" She never at any time asserted that the instruments and bottles did not belong to her. She did not even feign ignorance of their presence in her home. Her answers and conduct were evasive and equivocatory. Not only did they fail to comport with an attitude or claim of innocence but in the circumstances existing at the time they indicated a consciousness of guilt. As accusatory statements they were admissible, especially when the accused failed to act as an innocent person would be expected to act in such an environment. (*People* v. *Gordon,* 61 Cal.App. 98, 100 [214 P. 276]; *People* v. *Willmurth,* 77 Cal.App.2d 605, 616 [176 P.2d 102].) She never did deny having made the statements, as did the defendant in *People* v. *Teshara,* 134 Cal. 542, 544 [66 P. 798], nor did she repel the implied accusation.

 (j) While under cross-examination Anne was asked whether when she went to appellant's house to have an abortion performed she knew that she was committing a criminal offense, and she answered, "I did not know it at that time." She was then asked whether she thought she was doing anything wrong, whether she thought it was right and lawful to do that sort of thing, and whether anyone had told her prior to her testifying that she would be guilty of a crime if she had done the acts that she described. Objections to all such questions were sustained. The matters referred to were immaterial and the rulings of the court were correct. The questions did not in any manner test the credibility of the witness. They did not tend to prove or disprove her truthfulness in her statement that she was pregnant when she visited appellant at the latter's home and did not prove or indicate a bias,

prejudice or hostility against appellant. That (1) she believed she was pregnant, and (2) she was actually pregnant, is shown by uncontradicted evidence. She found in appellant a willing aid (for a consideration of $150) to relieve her of her condition. Moreover, it is not to be believed that she would have expended that amount of money or that she would have been willing to suffer the pain and anxiety attendant on such an operation if she had not believed that her condition was as she described.

A witness cannot be impeached by evidence that he had committed wrongful acts other than the conviction of a felony. (Code Civ. Proc., § 2051; *People* v. *Buyle,* 22 Cal. App.2d 143, 150 [70 P.2d 955].) Knowledge on the part of the witness that she was violating the law in submitting to an abortion "could not exculpate appellant from criminal responsibility for the illegal acts she was charged with having committed." (*People* v. *Pappens,* 5 Cal.App.2d 544, 547 [43 P.2d 371].)

Appellant's contention that in sustaining the objections to the questions above outlined the court unreasonably or erroneously limited the cross-examination of the witness is without merit. The contention that the evidence sought was admissible for the purpose of showing whether or not Anne was an accomplice of appellant is likewise without merit. She was not an accomplice although section 1108 of the Penal Code required corroboration of her testimony. (*People* v. *Clapp,* 24 Cal.2d 835, 839 [151 P.2d 237]; *People* v. *Wilson,* 25 Cal.2d 341, 346 [153 P.2d 720]; *People* v. *Alvarez,* 73 Cal.App.2d 528, 531 [166 P.2d 896].)

3. *Alleged misconduct of the district attorney.* Appellant charges prejudicial misconduct on the part of the prosecutor.

(a) The deputy district attorney displayed to the jury the instruments to which we have referred while showing them to a witness, a deputy sheriff who had found them in appellant's residence, in order that he might identify them. Appellant, Anne and others were present when they were found; they were identified by the officer as those that were on appellant's premises; the doctor testified that they could be used to perform an abortion; Anne testified to the use of an instrument inside her; they were received in evidence. Since they were relevant evidence in the case (*People* v. *Baillie,* 133 Cal.App. 508, 514 [24 P.2d 528]; *People* v. *Pierson,* 69 Cal.App.2d 285, 297 [159 P.2d 39]) and tended to

connect appellant with the offense (*People* v. *Wilson, supra*) the prosecutor was not guilty of misconduct in exhibiting them to the jury. (*People* v. *Mundt,* 31 Cal.App.2d 685, 689 [88 P.2d 767].)

(b) In his argument to the jury the deputy district attorney commented on appellant's failure to testify and to deny or explain the damaging evidence given against her. Appellant contends that such comment, together with section 13 of article I of the Constitution of California and section 1323 of the Penal Code permitting the same, denied her due process of law in violation of the Fourteenth Amendment to the Constitution of the United States. Appellant admits, as she must, that prior to the filing of her brief the same objection had been made in reviewing courts and had been overruled. (*People* v. *Adamson,* 27 Cal.2d 478, 486 [165 P. 2d 3]; *Adamson* v. *California,* 332 U.S. 46 [67 S.Ct. 1672, 91 L.Ed 1903, 171 A.L.R. 1223]; rehearing denied, —— U.S. —— [68 S.Ct. 27, 92 L.Ed. ——.) We have examined the prosecutor's argument to the jury and find nothing in it that transcends the bounds of legitimate argument on the evidence and on appellant's failure to testify in her own behalf.

In this connection appellant repeats at unnecessary length all her previous arguments relating to the sufficiency of the evidence to prove the requisite elements of the offense and her objections to the admission of certain evidence. Since we have held that the evidence is sufficient to prove all the elements of the crime and to sustain the judgment and that there was no error in the reception of the evidence the district attorney had a right to comment on any and all of it.

The comments permitted to a prosecutor are not limited to matters that are in evidence. (*People* v. *Eggers,* 30 Cal.2d 676, 693 [185 P.2d 1]; *People* v. *Kynette,* 15 Cal. 2d 731, 757 [104 P.2d 794]; *People* v. *Molina,* 126 Cal. 505, 508 [59 P. 34].) Reasonable inferences may be drawn from the evidence by counsel in argument. (*People* v. *Hoyt,* 20 Cal.2d 306, 318 [125 P.2d 29]; *People* v. *Burdg,* 95 Cal.App. 259, 269 [272 P. 816].)

4. *Alleged errors in refusing instructions to the jury.* Appellant requested several instructions that were refused by the court by reason of which she assigns error. The instructions were to the effect (1) that it must be shown that the operation was performed with the intent of producing an abortion, and that it must be proved that the accused be-

lieved that the woman was pregnant at the time; (2) that the jury should acquit if they had a reasonable doubt (a) as to whether defendant believed that Anne was ·in fact pregnant, (b) as to whether instruments were used, (c) if used, whether they were used to produce a miscarriage; (3) that the belief by defendant of the pregnancy of Anne must be proved with the same degree of precision as every other material fact; (4) that if defendant administered drugs to the girl or used instruments on her she would not be guilty if she did not know or believe that the girl was pregnant; (5) that specific intent to procure a miscarriage must be proved to the exclusion of every reasonable doubt.

At the request of appellant the court gave an instruction to the effect that the gist of the offense charged against defendant is that she used an instrument with the intent thereby to procure the miscarriage of the woman named in the information; that unless defendant had actual knowledge of the pregnancy of the woman or a belief that she was pregnant the required intent to procure the miscarriage of the woman could not exist; that the question arising was whether there was evidence other than that of the woman of sufficient substantiality to warrant a conclusion by the jury of the requisite guilty intent on the part of defendant; that if the prosecution failed to establish such requisite guilty intent on the part of defendant the jury must acquit her.

Every element of the refused instructions is contained in the instruction that was given, and the court did not err in declining to repeat the same theme. When a matter is covered by an instruction a defendant cannot complain because the court refuses to reiterate its substance in different words or in a different arrangement of words. The court is under no necessity to emphasize a point by repetitive statements in several separate instructions.

We have examined the entire set of instructions given by the court and find that on the whole they are liberal in setting forth all the points on which appellant relied at the trial and on which she relies on this appeal—in some respects more favorable than she had a right to expect.

An examination of the entire record shows that the trial judge was meticulous in rejecting all evidence offered against appellant concerning which there appeared to be a reasonable objection, in allowing the most liberal and extensive cross-

examination of the witnesses for the prosecution, and in fully covering in the instructions all points raised by appellant in her defense. We find no error in the record.

Judgment affirmed.

Moore, P. J., and McComb, J., concurred.

A petition for a rehearing was denied February 27, 1948, and the following opinion was rendered:

THE COURT.—Appellant has filed a petition for rehearing insisting, as she did in her opening brief, that Dr. Newbarr's evidence concerning the bottles, cartons and other containers found in her home was incompetent because his testimony related to their contents without his having made an analysis thereof. On the contrary his evidence is replete with statements that he had no knowledge of the contents of the various containers but that his testimony referred only to the purpose and effect of the drugs named on their labels. (The emphasis indicated in the following quotations of questions and answers is added.)

(1) With reference to one of the containers the witness was asked: "From an examination of the label can you tell me what that drug is?" An objection to the question was properly sustained, after which these questions and answers appear:

Q. Can you read the label? A. Yes, sir.

Q. Will you do so, please? . . . A. It says "Phenobarbital 1½ grain; acetylsalicylic acid (aspirin) 5 grains; caffein alkaloid ¼ grain; and tincture of gelselseminum 3 mins." . . .

Q. Are you familiar with this particular drug, Doctor, *described on that label?* A .Yes, sir.

(2) Referring to another container: Q. You have said as to the ingredients *shown on the label,* is that correct? A. Yes, sir.

(3) When asked concerning a box he was interrogated by counsel for appellant as follows: Q. You are merely *reading from the label,* aren't you? A. Yes, sir.

(4) Q. Doctor, what is that name? Will you pronounce it? A Mercurophen, M-e-r-c-u-r-o-p-h-e-n. THE COURT: Those eight are next? MR. KEELER: That is the eight, and all the cartons *are labeled* "Mercurophen."

(5) Q. Directing your attention to three only of what appears to be 20 tubes *labeled* "Amp," ampule, "Novocaine,

1 per cent solution.'' Do you recognize that as a medicine, Doctor? . . . A. Yes.

(6) Q. I show you here a pasteboard carton *labeled* ''Procaine hydrochloride, 2 per cent solution.'' Do you recognize that, Doctor, as a form of medication? A. Yes, sir . . .

MR. LAVINE: Just a minute, Doctor. Are you reading from the label? A. That is right. *I am reading from the label.*

(7) With reference to a bottle which the witness referred to as containing ergotrate: MR. LAVINE: Are you reading from the *label* only? A. Yes, sir. MR. LAVINE: Have you made any examination of the contents of the bottle itself? A. No, sir.

(8) Concerning another exhibit: MR. LAVINE: Just a minute, Doctor. I must inquire if he is just reading—are you just *reading from the label?* A. Yes sir ,and looking at the capsules. MR. LAVINE: Without making an examination of the contents? A. That is right. MR. LAVINE: That you have before you, and you have not made any examination of the contents? A. No, sir.

(9) Q. Here is a box *labeled* ''Donnatal'' or however you pronounce it. Do you recognize that as a medical product, Doctor? A. Not the name; however, the ingredients are common. Q. You are indicating the ingredients *from the label,* are you? A. Yes, sir. Q. And what are those ingredients *given on the label?* A. It is phenobarbital, hyoscyamine, sulfate, stropine sulfate, and hyoscine hydrochloride.

(10) Q. Doctor, would you be just kind enough to enumerate what else is in the box just in order that we may complete the exhibits? A. There are some ampules of distilled water. An empty bottle *with a label* of ''Rostigmin bromide.'' This is an empty bottle with directions, but it doesn't state what is in it. Benzadrine sulfate, empty bottle, a half a tablet. MR. LAVINE: *You are just reading now from the label?* A. That is right. And a box of antiphlogistine. And a piece of rubber sheeting. One ampule of procaine hydrochloride, 2 per cent.

(11) Concerning a bottle which the witness said contained penicillin: MR. LAVINE: You are just reading from the label, are you, Doctor? You mean—no—reading from the label when you are examining the preparation, Doctor? THE WITNESS: Looking at the ampule. MR. LAVINE: Did you examine the contents of the ampule? THE WITNESS: No, sir. MR.

LAVINE: Don't know whether it contains penicillin or not, then? THE WITNESS: *No, sir, except for the label.*

These are sufficient examples of the evidence to demonstrate that the witness was testifying concerning the various drugs which were named on labels of containers and that he did not claim to have any knowledge whatsoever of the contents of the bottles, boxes and cartons that were exhibited to him.

The only other point made on the petition for rehearing is that there was no evidence that appellant at any time touched the complaining witness. Anne testified that when she was taken into the room where the table was located appellant "was sitting there when I sat on the table"; that when the witness was on the table with her feet in the stirrups appellant was at her feet, "she was right between my legs"; the witness said that she closed her eyes and heard a "vacuumy" sound and "heard a faucet running"; that while appellant was in that position the witness felt something in her private parts and that she felt something inserted inside. There is no intimation in the record that any person other than appellant performed or could have performed the operation.

Appellant's petition for a hearing by the Supreme Court was denied March 18, 1948. Carter, J., and Schauer, J., voted for a hearing.